Richard GEDIMAN and Bernice
Gediman, Plaintiffs,

v.

SEARS, ROEBUCK & CO., and Northern
Electric Co., Defendants.

Civ. A. No. 76–3456–Z(A).

United States District Court,
D. Massachusetts.

Feb. 20, 1980.

James B. Keane, Fredric A. Swartz,
Swartz & Swartz, Sullivan & Cronin, Anthony D. Murphy, Boston, Mass., for plaintiffs.

Parker, Coulter, Daley & White, Arthur
F. Licata, Boston, Mass., for defendants.

## OPINION

ALDRICH, Senior Circuit Judge.*

On May 2, 1976, about 7:00 A. M., flames rising from the foot of her electric blanket woke Mrs. Richard Gediman from a sound sleep. Her outcry brought Mr. Gediman, who had risen an hour earlier and was elsewhere in the house. Their joint but futile attempts to put out the fire, which included dragging the flaming blanket and queen-size mattress into the hall, resulted in their both being burned. Mr. Gediman then called the fire department, but the fire spread and the whole house was ultimately badly damaged and virtually its entire contents allegedly destroyed. This diversity action was brought by both Gedimans against Sears, Roebuck & Co. and Northern

* Sitting by designation.

Electric Co. Separate trials—to the same jury—were held on liability and damages, each with special questions. Very little was disposed of before trial, and very little more, according, to one party or another, by the jury findings. A plethora of arguments are advanced in support of post-trial motions by both parties.

*Defendants' Liability.*

The jury found that Sears, Roebuck was the seller of the blanket and controls, and that Northern Electric was the manufacturer of the electrical components. Defendants' twice-advanced claim that the evidence did not warrant these findings does not merit comment, other than a critical one for wasting time.[1] The jury's findings of a breach of warranty of merchantability and fitness must be faced, however. Defendants contend that they are without support in the evidence.

Plaintiffs orally waived the counts for negligence. The unexcepted-to charge required the jury, in order to find for plaintiffs, to find that the blanket was not "reasonably safe for . . . the reasonable intended use and the expected capacity of the anticipated user . . . [or] there was a defect in the blanket's controls when it was sold or [that could] reasonably be expected to develop in normal use . . . [or] that there was a danger [in] sufficiently warned about."[2] The blanket was introduced in evidence. A roughly semicircular piece, having a 3-foot diameter at the center of the blanket's bottom edge, had been consumed. Also missing were the electrical receptacle previously at the blanket's foot and the plug therefor connecting the cord from the controls to the blanket's inner network. (This was a dual control, double blanket, with a single connector.) The insulation was burned from the last foot of the cord, and the exposed copper wires were fused together at the end. The evidence fully supported the expert testimony that the blanket had been ignited by heat from a short-circuit arc, or a spark, near or at the connector at its foot. According to the expert testimony there could have been an arc on one side or the other of the connector because of failure of the insulation of the wires, or a spark at the connector by reason of its being loose. Because all relevant parts were missing, it could not be determined which was the cause. Under these circumstances plaintiffs have a heavy burden. There must be a basis for the jury's exclusion of all causes for which defendants would not be legally responsible.

■ Spelling this out, if there were a number of possible causes, collectively probable, although it could not be said that any one of that group was more probable than another, plaintiffs would be entitled to go to the jury if every alternative in that group were a liability-producing event, even though there were a number of other possibilities, so long as these others, singly, or collectively, could be found unlikely or remote. *Cf. Currie v. Lee Equipment Corp.,* 1973, 362 Mass. 765, 768, 291 N.E.2d 403; *Potter v. John Bean Div. of Food Mach. & Chem. Corp.,* 1962, 344 Mass. 420, 424–25, 182 N.E.2d 834; *Bennett v. Cohen,* 1942, 310 Mass. 714, 39 N.E.2d 571. I consider the fair intendment of plaintiffs' expert (supplemented somewhat by defendants) to encompass the following possibilities in such a probability group.

1. Failure of insulation of wiring on either side of the connector,

(a) due to faulty insulation, or

(b) due to abuse.

2. Loose connector,

(a) due to improper manufacture, viz., inability to withstand normal wear, or

(b) due to abuse, or

---

1. Strictly, Northern Electric's answer to interrogatories admitted that it "designed the controls." However, it further answered that during the warranty period it serviced free for overheating, wiring or electrical defects, and defects in the plugs or connectors, warranting a finding of responsibility for the entire circuitry.

There was perhaps no basis for finding that Northern Electric manufactured the blanket itself, but, as the case developed, this was irrelevant.

2. The transcript of the charge contains many minor errors, but none of any significance.

(c) because insufficiently plugged in.

Although plaintiffs' expert criticized the insulation material, there was no evidence affirmatively showing this to have been the cause of a short circuit. On the other hand, there was substantial evidence by both plaintiffs that there had been no abuse or mishandling. The same could be said with respect to the connector. If there remained a possibility that on this occasion the plug had not been properly connected, and that this had been plaintiffs' fault, this does not help defendants. There was no warning in the instruction brochure that a loose connection could have dangerous consequences. The jury could find that an uninformed user would suppose that failure to connect tightly would merely cause the blanket to cease functioning, and, accordingly, could impose liability for a failure to warn. *See Schaeffer v. General Motors Corp.*, 1977, 372 Mass. 171, 173–74, 360 N.E.2d 1062; *H. P. Hood & Sons, Inc. v. Ford Motor Co.*, 1976, 370 Mass. 69, 75, 345 N.E.2d 683.

■ Thus there were affirmative reasons why the jury could reject the possible causes listed by the experts which would not impose liability in favor of the ones that would. Accordingly, the only question is whether there were further possibilities which would not cause liability but could not be found unlikely. Defendants suggest there are a number. However, the jury could exclude them all.

a) Misuse. Plaintiffs testified affirmatively to careful use.

b) A frayed extension wire. Not only was there no evidence of an extension wire, but because of the nature of a dual blanket plug, the extension could not be used at the blanket end.

c) Mr. Gediman might have stepped on a control. The controls were unbroken. Nor was there any evidence that this would have caused a spark at the blanket end.

d) A pin might have been inserted into the wires. There were two general areas: the three-lead wire, or the single coil wire throughout the blanket. There is no evidence that a pin through the latter would have caused a spark or short circuit. It is a remote possibility in any event. The jury could also find that a pin in the lead wires where the blanket caught fire was an extremely unlikely possibility.

e) The blanket might have been folded so as to pinch a wire. The previous testimony as to care would apply here.

f) The flames might not have been as high as plaintiffs testified. The possible relevance of this does not appear.

g) Perhaps Mr. Gediman came back with his pipe. Mr. Gediman credibly denied it.

Defendants argue there were "a thousand other possibilities." When pressed, they could not name them. If they are so remote that counsel cannot think of them, they are too remote to be concerned with.

In sum, giving defendants' suggestions their full weight, they could be found either remote, unlikely, or nonexistent.[3] Defendants' motion for judgment n.o.v. must fail.

*Plaintiffs' Liability—The Measure of Damages.*

The jury found, in answer to special questions, that the total property damage due to the fire was $37,600; that the extra living expenses were $8,000; that Mr. Gediman's personal injuries, pain and suffering amounted to $2,000, and Mrs. Gediman's to $8,000. It further found that their pre-fire conduct did not contribute to the loss, but that their "fault . . . after the fire contributed to the [damages]" 40% in the case of the fire loss damages; and 40% to Mr. Gediman's and 50% to Mrs. Gediman's personal injury damages. This raises both factual and legal questions.[4]

---

**3.** This discussion omits reference to the coil wire in the control which served two purposes, as part of the thermostat, and as a fuse in case of a short. There was testimony that it was defective. Though unclear, on no interpretation could it help defendants.

**4.** One question that it does not raise is plaintiffs' post trial contention that the jury in assessing damages, may have accepted plaintiffs' larger figures and made the reductions attributable to the found percentages of fault. This subject was not mentioned in the charge, and the jury would have been highly sophisticated

■ Plaintiffs testified that the flames were 3 to 4 feet high; that Mr. Gediman first tried, ineffectually, to put the fire out with water carried in his cupped hands from the bathroom; that they together then tried unsuccessfully to smother the fire with a spread from the bureau; that this took a minute or more; that they then dragged the blanket and mattress through a doorway into the hall, getting burned and, in the case of Mrs. Gediman, badly straining an arm, in the process; that this procedure occupied another three minutes; that Mr. Gediman then called the fire department and they went out of the house. While conceivably all this conduct and delay is excusable due to the shock of discovering the fire, it need not be. The extent that a plaintiff's actions are chargeable to a defendant must be a question of fact. *Hawthorne v. Holland-America Line*, D.Mass., 1958, 160 F.Supp. 836; *Rollins v. Boston & Me. R.R.*, 1947, 321 Mass. 586; 74 N.E.2d 664; *Brown v. Hathaway Bakeries, Inc.*, 1942, 312 Mass. 110, 114, 43 N.E.2d 328. The jury was instructed that the burden of proving plaintiffs' fault was on the defendants. It could well have concluded that there was excessive reaction and affirmative fault.

■ The findings of plaintiffs' fault raise three possible legal issues: the Massachusetts statute regarding contributory negligence, Mass. G.L. c. 231, § 85; the common law duty to mitigate damages, and, even more directly, the question of causation. This last in itself is clear and sufficient. To whatever extent plaintiffs' own, unexcused, conduct caused or increased damages, defendants, correspondingly, were not the cause, and are not to be held responsible. *Murray v. Fairbanks Morse, Beloit Power Systems, Inc.*, 3 Cir., 1979, 610 F.2d 149. The present was not even a case of joint cause responsible for a single result, but was one of expansion of the damages resulting from plaintiffs' own actions, and thus an even stronger case for apportionment. The jury had a chalk and a description of the house. Apportioning fault is a peculiarly proper jury function.

*Damages.*

■ Immediately prior to trial it was brought to my attention that plaintiffs had received some $40,000 on a fire policy, and did not wish this fact to come out in connection with the expert testimony on damages. I agreed because of the possible prejudice. Thereafter one Seltzer qualified as an expert and testified that the content of the house, of which he furnished a written itemization and breakdown, was rendered worthless, and had been worth $68,000 at the time of the fire. Approximately this figure had been previously given by Mrs. Gediman, over objection, without any itemization. I had allowed that testimony on the ground that she was an owner, *cf. Munro v. Stowe*, 1900, 175 Mass. 169, 55 N.E. 992, and in anticipation of the expert's detailed listing. Seltzer further testified that the fair market value of the house prior to the fire was around $40,000 and afterwards $17,000.[5]

---

to have done it. Although plaintiffs objected to the legal propriety of the questions, they did not object to form, and took no exceptions to the charge in this regard. Their speculations that the jury, on its own, engaged in such conduct are rejected. There is, moreover, an iron-clad answer; the $8,000 living expense figure returned by the jury was in accord with plaintiffs' testimony, and obviously had not been reduced.

5. To complete the picture, both plaintiffs testified to somewhat comparable figures for the house. The basis for their before-fire figures was slim; for a post-fire figure there was nothing supportive whatever. Plaintiffs testified they owned the house jointly. At least once during the trial I instructed the jury, without objection, that the law permitted an owner to testify to value with no basis for his opinion other than ownership.

With respect to the value of the contents, Mr. Gediman originally said $70,000, but on cross-examination became quite confused on the subject of both house and contents, and ultimately referred to his and Mrs. Gediman's agreement on $40,000 after some conversation with Seltzer. While he may well have been thinking of the insurance settlement, when pressed as to who he agreed with, he resisted saying this, and left the impression that this was just him and Mrs. Gediman. What was the total effect on the jury of this reduced figure agreement is uncertain, but at least it introduced what might

On cross-examination Seltzer was asked how much he had charged for making the appraisals. He replied that he did not recall, but added that it was 10% of the recovery. At this point I mentally revoked my undertaking to exclude insurance, both because I had made it without full knowledge of the facts, and because its purpose had disappeared. It thereupon developed that Seltzer had been employed not only as an appraiser, but as a paid negotiator on behalf of the plaintiffs to reach a settlement with their fire insurance company, with his remuneration to be 10% of what he succeeded in recovering. Obviously he had prepared his appraisal on a the-higher-I-make-it, the-higher-I-may-be-paid expectation. This led me to charge the jury—to which plaintiffs excepted—that I was unhappy to learn the terms of Mr. Seltzer's employment. After saying that he had expert qualifications, I stated,

> "Whether he is impartial or not is another matter. . . . Mr. Seltzer was employed to give an opinion on the basis that the higher his opinion, the more he would be paid.* I had not realized this

> * This was not strictly accurate; I should have said, ". . . would hope to be paid." The difference is not significant; nor did plaintiffs make a point of it.

> when he went on the stand, and I do not think that I am exceeding my function when I say that I was very unhappy to learn this on cross examination. I do not say that you cannot give credence to his testimony, but I think this is a factor you may well want to take into consideration."

I felt, and still feel, that this was an understatement in plaintiffs' favor. The assistance a jury is to receive from expert opinion should not be tempered by the need to speculate how much of a discount to allow for personal interest. The very fact that a jury needs expert testimony means it lacks qualifications to make such a judgment. An agreement to give an opinion on a contingent basis, particularly on an arithmetical scale, attacks the very core of expert testimony. *See McPherson v. School Dist. No. 186,* S.D.Ill., 1978, 465 F.Supp. 749, 764; *Del Noce v. Delyar Corp.,* S.D.N.Y., 1978, 457 F.Supp. 1051, 1057; *Keyes v. School Dist. No. 1,* D.Colo., 1977, 439 F.Supp. 393, 419; *cf. Person v. Association of Bar of City of New York,* 2 Cir., 1977, 554 F.2d 534, *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282. Such an agreement is classified by Williston on Contracts, 3d ed. 1972, § 1716 under "Bargains Obstructing Justice." *See also* Restatement of the Law, Contracts, 1932 § 552(2).

It is true that Seltzer was not hired to, and did not, prepare his figures for use in the case at bar. However, he used in the case at bar figures that he had prepared under exactly the same temptations of self interest. Any distinction is lacking in substance. This conclusion is not affected by plaintiffs' representation during the argument on these motions, which I accept, that it is proper practice for insurance adjusters to be compensated on a percentage basis. It is not a question of ethics that concerns me, but testimonial worth. With many witnesses, and, of course, parties, interest is unavoidable. An expert, however, whose only relevance is his expertise, should not have that expertise flawed.

Seltzer's testimony having been introduced, defendants sought to claim that the settlement represented the actual value. I took pains to point out in my instructions to the jury that this was not necessarily so. In fact the jury awarded somewhat more, as the fire policy settlement included living expenses.

This opinion is responsible to, and covers all pending motions. They are all denied.

well be termed a rift in the lute. Tennyson's Idylls of the King, quoted in *Lyman v. New* *England Newspaper Publishing Co.,* 1934, 286 Mass. 258, 259, 190 N.E. 542.