## New England Telephone & Telegraph Company *vs.*
## Board of Assessors of Boston.

Suffolk.   March 7, 1984. — August 23, 1984.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Lynch, JJ.

*Taxation,* Real estate tax: value. *Witness,* Expert, Fee. *Evidence,* Expert opinion.

In a proceeding before the Appellate Tax Board for abatement of a tax on real estate claimed to be overvalued, the board erred in disregarding the testimony of an expert witness for the taxpayer upon a finding that the witness's compensation would in part be dependent on the outcome of the case, where there was no evidence that at the time the witness testified he believed that he then had a contingent fee arrangement with the taxpayer. [867-873]

In a proceeding before the Appellate Tax Board for abatement of a tax on real estate claimed to be overvalued, there was sufficient evidence, apart from certain testimony disregarded by the board, to suggest that the city's assessments were too high. [874-875]

Appeal from a decision of the Appellate Tax Board.

*Philip Burling (Stephen B. Deutsch* with him) for the taxpayer.

*John T. Gaffney, Sr.,* Special Assistant Corporation Counsel (*Peter Antell,* Special Assistant Corporation Counsel, with him) for the defendant.

Wilkins, J. The Appellate Tax Board (board), in considering the appellant telephone company's challenge to the assessment of its property at 185 Franklin Street, Boston, for the fiscal years 1979, 1980, and 1981, determined that the taxpayer had failed to prove that the fair cash value of the property was less than the assessed value of that property on any of those relevant dates. The board reached this conclusion after it determined that it should totally disregard the testimony of the telephone company's principal expert witness, who, the board decided, had a contingent fee arrangement with the company

that gave him a financial interest in the outcome of the proceedings. We conclude that the evidence does not show that, at the time he testified, the principal expert had an expectation that his compensation would be based on the results obtained in the company's appeal such that the board should have disregarded his testimony in its entirety. We note further that, entirely apart from the testimony of the company's principal expert, the company's evidence presented a prima facie case of overvaluation which the board should have addressed.

This appeal concerns the assessed valuation of the telephone company's property at 185 Franklin Street, which consists of the entire block bounded by Franklin, Congress, High, and Pearl Streets, in Boston. The building was designed to house the corporate headquarters of the company and switching equipment to service long-distance telephone calls. During the years in question, approximately one half of the building was used for office and administrative purposes and one half for switching equipment. The company's evidence tended to show that the highest and best use of the property was for office purposes. The city presented no direct case before the board on this question nor on any other issue, expressing its reliance on the disqualification of the company's principal expert and the failure of the company to prove its case.

For each of the relevant fiscal years, the city assessed the property at $25,164,000.[1] The parties stipulated to the disproportionate assessments in each year. As a result of that stipulation, the company was entitled to be assessed at 22.4% of the full and fair cash value of the property for fiscal year 1979, 45% of that value for fiscal year 1980, and 36% of that value for fiscal year 1981. It was the company's burden as to each year to prove that the fair cash value of the property on the assessment date (January first of the calendar year in which the fiscal year commenced) was less than the fair cash value

[1] The tax rate for fiscal years 1979 and 1980 was $252.90 per one thousand dollars of valuation and the taxes assessed for each year were $6,363,975.60. The tax rate for fiscal year 1981 was $272.70 and the taxes assessed for that year were $6,862,222.80.

inherent in the city's assessment. *Foxboro Assocs.* v. *Assessors of Foxborough,* 385 Mass. 679, 684 (1982).

The central issue on this appeal, and the issue on which the board decided the company's appeals against it, concerns the question whether one Robert L. Beal had a contingent fee arrangement which warranted the board's decision to disregard his testimony in its entirety. There was no issue as to Beal's general qualifications as an expert on real estate values. The telephone company retained Beal in 1978 to review the assessments on various company properties in the Commonwealth, including the subject property, and, where thought appropriate, to assist in filing applications for abatement and to engage in discussions with assessors. He and his associates were paid on the basis of their time for this work.

In July, 1979, after the company's appeal as to the fiscal year 1979 assessment of the subject property had been filed, Beal wrote to a representative of the company proposing, as to settlement negotiations and trial work, that his firm be compensated on a contingent fee basis for its work. His letter stated that "[i]t is the normal practice in real estate tax abatement matters that firms and attorneys representing a particular client are on a contingent fee basis, and these charges generally approximate one-third of a cash recovery for the years involved, including interest." After discussion of the subject of the fees to be paid to the Beal firm, Mr. Robert D. Bruce, general attorney for the telephone company, wrote Beal on October 18, 1979, to "recapitulate the understanding which we reached last week concerning the fee arrangement with The Beal Companies for its handling of the applications for abatement and related appeals" as to particular properties. He wrote that "[y]our charges for services rendered will be based primarily upon your records of time expended by the professional employees in your office." He added that "[y]our fees will include, in addition to the amount of your various time charges, some monetary recognition of successful results especially where a favorable disposition is achieved which is unrelated to the time charges involved." It was this sentence in Mr. Bruce's letter on which the board principally relied in concluding that the

company and Beal had "a fee arrangement based in part on time charges and in part on abatements and tax savings obtained," which the board characterized as "a form of contingency fee."

Mr. Bruce and Beal testified concerning the fee arrangement between the telephone company and Beal. The board was entitled to disbelieve this testimony and to rely on the terms of the letter in deciding whether there was or was not a contingent fee arrangement. However, the factual issue of importance was whether, when he testified, Beal believed that his compensation in whole or in part would be based on the results obtained. It is the potentially adverse influence of the motivation to enhance his compensation that makes a contingent fee arrangement for an expert witness inappropriate. The board's findings did not focus on this question. On this question the testimony of Mr. Bruce and Beal was of significance. Mr. Bruce testified that the possibility of compensation in addition to payments for time charges covered "situations where a successful result might be obtained from negotiations . . . where the result was obtained with a very small expenditure of time." He further testified that the telephone company had never compensated Beal on a basis other than his time charges. On cross-examination, Mr. Bruce testified that a situation had never arisen to which the sentence in the letter concerning additional compensation applied and that it could not be applied as to any remaining case.

The subject of Beal's possible contingent fee arrangement was not raised during his direct examination. On cross-examination, Beal testified that he had had contingent fee arrangements in certain tax abatement cases before the board; that he proposed a contingent fee arrangement to the telephone company; that he became a member of the American Society of Real Estate Counselors in April, 1980; that, when he proposed a contingent fee arrangement to the telephone company, he was not a member of that society and was not aware that the Standards of Professional Practice adopted by the society provided that "[f]ees for counseling services . . . should not be

contingent on finding any particular result or value."[2] Beal further testified that he abided by his own code of ethics, which "[f]rom time to time . . . [could] include a contingent fee arrangement." He testified also that the telephone company had not paid him "monetary recognition for successful results" and that, if there were a cash abatement in this case, he would not expect "a substantial monetary recognition." On redirect examination, Beal testified that Mr. Bruce had told him in July, 1979, that his office would be paid on the basis of time and that he had been paid on the basis of time.

As can be seen from the testimony, the question of Beal's entitlement to be a witness was an active issue at the hearing. Just prior to Beal's testifying, on the request of counsel for the company, the board member hearing the case ruled that, if Beal had a financial interest, it would go to his credibility "and would not disqualify him." In the course of Beal's cross-examination, counsel for the assessors moved to disqualify Beal and the motion was denied. At the conclusion of Beal's testimony, the assessors moved to strike Beal's testimony and that motion was also denied. Counsel for the company said, "On that basis that concludes the Company's direct case." The following day, the assessors rested their case without presenting any evidence.

We turn first to the board's findings of fact and report and its opinion to see how the board treated Beal's testimony. Although in its findings the board said ambivalently that it "could give little or no weight to Mr. Beal's testimony," we think it clear that it rejected any consideration of Beal's testimony. In its opinion the board said: "The narrow issue here is: Did the appellant fail to sustain its burden of showing overvaluation by reason of the Board's finding that the testimony of its expert witness, because of his contingency fee

---

[2] Beal also testified that he was not familiar with the provision in the Code of Professional Ethics and Standards of Professional Conduct of the American Institute of Real Estate Appraisers (of which Beal was not a member) to the effect that "[i]t is unethical for a Member of the Institute to accept an appraisal assignment on the condition that his compensation will be a percentage of the damages."

agreement and his financial interest in maintaining with the appellant a continuing business relationship, including an expectation of more real estate appraisal and consulting work, had no credibility [?] The Board answers this question in the affirmative."

We shall focus our attention on the contingency fee arrangement point, rather than on Beal's expectancies concerning future business, and shall assume that the board would have disregarded Beal's testimony on this ground alone. We proceed on this basis because Beal's expectancies concerning future business cannot be a ground for disregarding his testimony. An expert witness's "financial interest in . . . a continuing business relationship, including an expectation of more real estate appraisal and consulting work" may bear on his credibility, but it does not warrant a blanket determination that the witness lacks credibility. Many forensic experts hope for future employment, including employment by the parties on whose behalf they testify in litigated matters. Such experts are retained to help present a point of view, and experienced administrative agencies are well able to recognize the possibility of bias and to apply such discounts and adjustments to such testimony as their administrative experience indicates. See *Assessors of Pittsfield* v. *W.T. Grant Co.,* 329 Mass. 359, 361 (1952); *Custody of a Minor (No. 2)*, 13 Mass. App. Ct. 290, 302 (1982). An expert witness is not disqualified because he may be involved in a number of contested matters for a client and hope for future participation in others. His arrangement for compensation and his hope for future employment are, of course, matters appropriate for consideration by the trier of fact. See *Chicago* v. *Van Schaack Bros. Chem. Works, Inc.,* 330 Ill. 264, 273-274 (1928).

Turning to the use of the contingent fee arrangement as the basis for disregarding Beal's testimony, we first point out that the scope of the definition of a contingent fee arrangement applicable to attorneys is narrower than the scope of the definition of a contingent fee arrangement applicable to expert witnesses. This court's rule defining a contingent fee agreement between attorney and client, S.J.C. Rule 3:05 (1), as appearing in

392 Mass. 865                                    871

New England Telephone & Telegraph Co. v. Board of Assessors of Boston.

382 Mass. 762 (1981), says that it is "an agreement, express or implied, for legal services . . . under which compensation, contingent in whole or in part upon the successful accomplishment or disposition of the subject matter of the agreement, is to be in an amount which either is fixed or is to be determined under a formula. The term 'contingent fee agreement' shall not include an arrangement with a client, express or implied, that the client in any event is to pay to the attorney the reasonable value of his services." Indeed, our cases have recognized that the results obtained for a client are a proper factor to consider in determining a reasonable fee for an attorney's services. See *First Nat'l Bank* v. *Brink,* 372 Mass. 257, 266 (1977); *Muldoon* v. *West End Chevrolet, Inc.,* 338 Mass. 91, 96-97 (1958). See also S.J.C. Rule 3:07, DR 2-106 (B) (4), as appearing in 382 Mass. 772 (1981).

On the other hand, any fee arrangement by which an attorney retains a witness "contingent upon . . . the outcome of the case" violates S.J.C. Rule 3:07, DR 7-109 (C), as appearing in 382 Mass. 793 (1981). An attorney may, however, pay, or acquiesce in the payment of, a "reasonable fee for the professional services of an expert witness." DR 7-109 (C) (3). The prohibition of DR 7-109 (C) against contingent fee arrangements with experts has been upheld against equal protection of the laws and due process of law arguments that such a restriction, in particular circumstances, irrationally barred the presentation of the plaintiffs' case. *Person* v. *Association of the Bar of the City of N.Y.,* 554 F.2d 534 (2d Cir.), cert. denied, 434 U.S. 924 (1977).[3]

---

[3] Subsequent to the *Person* case, the Court of Appeals for the Second Circuit concluded that an agreement to pay an expert witness $150 an hour for his services did not run afoul of DR 7-109 (C), even if it was likely that the expert would not have tried to collect $150 an hour for his services, if the action had been concluded unsuccessfully. *Seigal* v. *Merrick,* 619 F.2d 160, 166-167 (2d Cir. 1980). Fees for experts in a derivative action contingent on the results were upheld in *Marine Midland Trust Co.* v. *Forty Wall St. Corp.,* 13 A.D.2d 118, 125-127 (1961), aff'd, 11 N.Y.2d 679 (1962), where the fee was to be fixed by the court, and the judge, as the trier of fact, was aware that the expert witnesses would look to him for

The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy. See *Weinberg* v. *Magid,* 285 Mass. 237, 239 (1934); *Belfonte* v. *Miller,* 212 Pa. Super. 508, 515 (1968); Restatement of Contracts § 552 (2) (1932);[4] 14 S. Williston, Contracts § 1716 (3d ed. 1972). Contra *Barnes* v. *Boatmen's Nat'l Bank,* 348 Mo. 1032, 1041 (1941).[5] Thus, if Beal had a contingent fee arrangement, it was unenforceable under these general principles. If there were to be any exception to this general rule, it is most unlikely that it would apply to an expert testifying on behalf of a large, solvent corporation. See *Person* v. *Association of the Bar of the City of N.Y., supra* at 535.

The significant question is whether Beal's testimony was fatally tainted because he believed at the time he testified that his firm's compensation would be based in part on the results obtained before the board. Thus, the essential question is not whether there was a contingent fee arrangement but whether Beal thought there was. Mr. Bruce, associate general counsel of the telephone company and a member of the bar of the Commonwealth, testified that Beal's compensation had never been based on results obtained and would not be in this case.

compensation. See *Matter of Shore,* 67 A.D.2d 526, 534-536 (N.Y. 1979). We imply no view as to whether the use of an expert witness would violate DR 7-109 (C) where the amount of the expert's fee would be determined by a judge.

[4] The subject is not dealt with explicitly in Restatement (Second) of Contracts (1981). See Restatement (Second) of Contracts (1981 and Supp. Table VI 1982).

[5] In *Joffe* v. *Wilson,* 381 Mass. 47, 52 (1980), we commented that an attorney had properly put forward as a witness in a tax case an accountant who had a contingent fee arrangement determined by a percentage of any savings to the taxpayers seeking a refund of Federal income taxes. The case raised neither the question of the enforceability of such an agreement nor the question of the probative worth of the accountant's testimony. Our comment that the attorney's use of the accountant as a witness was proper should not be construed as an approval of the use of an expert witness whose fee is contingent, in whole or in part, on the results of litigation. Since the *Joffe* case, we have noted that testimony that an expert witness lawyer's fee "is to some extent a function of the ultimate success of the people who hire him" is suggestive of an improper contingent fee arrangement. *Chase* v. *Pevear,* 383 Mass. 350, 359 (1981).

Beal himself testified that his compensation would be based on time. Even accepting the board's right to disbelieve their testimony and to assume that counsel for the company was offering a witness who had a contingent fee arrangement in possible violation of DR 7-109 (C), we see no evidence that at the time Beal testified he believed that he then had a contingent fee arrangement with the company applicable to this case.

Even if Beal held such a belief, the board in its opinion and the assessors in their brief have cited no case holding, or even stating, that a trier of fact may, as a matter of law, totally disregard evidence presented by an expert witness who had a contingent fee arrangement. In *Gediman* v. *Sears, Roebuck & Co.,* 484 F. Supp. 1244 (D. Mass. 1980), the trial judge learned during the cross-examination of an expert witness that he had a contingent fee arrangement based on 10% of the amount recovered. The judge instructed the jury that they could give credence to the expert's testimony but that the contingency arrangement was "a factor you may well want to take into consideration." *Id.* at 1248. When a jury is involved with a case in which expert testimony is presented, "[t]he very fact that a jury needs expert testimony means it lacks qualifications to make such a judgment. An agreement to give an opinion on a contingent basis, particularly on an arithmetical scale, attacks the very core of expert testimony." *Id.* In the case before us, the alleged contingency was not under any view of the evidence a fixed sum or ascertainable under a formula and, more importantly, the testimony was presented to an experienced administrative agency accustomed to dealing daily with expert witnesses and their testimony concerning rates of return, rents imputed to premises, allowances for expenses and vacancies, and similar issues. We conclude that the board should not have disregarded Beal's testimony.

The board should now assess the evidence that was before it, discounting, where appropriate, Beal's conclusions because of any interest he may have had because of his relationship, present and future, with the company. As to the matter of any contingent fee arrangement, however, we believe the board may properly consider that basis for bias only if it finds that

at the time he testified Beal believed his fee was contingent. From our review of the record, we doubt whether such a finding would be supported by substantial evidence. If the board reopens the record and Beal should testify again, a contingent fee arrangement as to that new testimony would not be a factor because, as we have said, and as Beal would then know, such an arrangement would not be enforceable in the circumstances of this case.

We add that, quite apart from Beal's testimony, evidence presented by the telephone company indicates that the city's assessments, particularly as to fiscal year 1979, may well be too high. The city assessed the property at $25,164,000 in each of the three years. Applying the disproportionate assessment ratio in the city for these years, as stipulated by the parties, the fair cash value of the property in effect determined by the city for each of the years involved in this case is as follows:

| Fiscal year | Fair Cash Value (rounded) |
| --- | --- |
| 1979 | $112,340,000 |
| 1980 | $ 55,920,000 |
| 1981 | $ 69,900,000 |

In order to sustain these fair cash values, whose fluctuations themselves raise a question, using the capitalization of income approach and a rate of return of 10% (a figure significantly in favor of the city), the income of the property after expenses, any vacancy allowance, and local real estate taxes, would have to be 10% of the fair cash value in each year. The real estate taxes in each year, as assessed, exceeded $6,360,000, or more than $9 for each square foot of rentable space in the building. Disregarding any allowance for vacancies, and using a conservative figure of $1,000,000 for operating expenses, to sustain the 1979 assessment, for example, the revenue generated by the imputed rents of the property would have to equal or exceed $18,594,000 ($11,234,000 [10% return], $1,000,000 [expenses], and $6,360,000 [taxes]), or more than $25 per square

foot. This rental figure exceeds by threefold the "gross potential fair economic rent" for fiscal year 1979 according to the company's evidence, including or excluding Beal's testimony. The comparable calculations for fiscal year 1980 and 1981, on the same assumptions, are not as dramatically disparate. They do, however, raise the same concerns.

If the board should conclude as to any fiscal year that the company has met its burden of proving that the fair cash value of its property was less than the fair cash value inherent in the city's assessment, but if the board should reject certain elements in the company's presentation, the board should make its own determination of the fair cash value on each assessment date. See *Foxboro Assocs.* v. *Assessors of Foxborough,* 385 Mass. 679, 684 (1982).

The decision of the Appellate Tax Board is reversed and the case is remanded to that board for further consideration in light of this opinion.

*So ordered.*