IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

FILED

March 16, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| GREG SWAFFORD, M.D., | ) | |
| | ) | **FOR PUBLICATION** |
| | ) | |
| Plaintiff/Appellee, | ) | **Filed:  March 16, 1998** |
| | ) | |
| | ) | Certified Question of Law |
| | ) | from U.S.D.C., Western |
| Vs. | ) | District of Tennessee |
| | ) | |
| | ) | |
| ROBERT G. "GREG" HARRIS, and | ) | Hon. Jerome Turner, |
| DARRELL R. RYLAND, | ) | U.S.D.C. Judge |
| Individually and "P.C.", | ) | |
| | ) | |
| | ) | |
| Defendants/Appellants. | ) | No. 01S01-9612-FD-00248 |

**For Plaintiff-Appellee:**
William J. Simmons
Memphis, Tennessee

**For Defendant-Appellant, Harris:**
William L. Bomar
GLANKLER BROWN, PLLC
Memphis, Tennessee

**For Defendant-Appellant, Ryland:**
George T. Lewis, III
Bradley E. Trammell
BAKER, DONELSON, BEARMAN &
  CALDWELL
Memphis, Tennessee

**FOR AMICUS CURIAE,
TENNESSEE MEDICAL
ASSOCIATION:**
Marc E. Overlock
Nashville, Tennessee

**FOR AMICUS CURIAE, TENNESSEE
DEFENSE LAWYERS ASSOCIATION:**
Dale H. Tuttle
Memphis, Tennessee

# O P I N I O N

ANDERSON, C.J.

The United States District Court for the Western District of Tennessee has certified the following questions to this Court pursuant to Rule 23 of the Tennessee Supreme Court[1]:

1. Whether a contract between a personal injury plaintiff and his physician to pay the physician a fee contingent on the outcome of litigation for the coordination of and consultation with respect to the medico/legal aspects of the lawsuit, including potentially the giving of expert medical testimony at trial, is enforceable under the laws of Tennessee;

2. Whether a contract between a personal injury plaintiff and his physician to pay the physician a fee contingent on the outcome of litigation for medical services and treatment (i.e., actual care and treatment for the injuries) to the plaintiff/patient is enforceable under the laws of Tennessee; and

3. If either or both of the above contracts are unenforceable, whether the physician may recover on a quantum meruit theory for the expert and/or medical services.

We accepted these important legal questions of first impression under Rule 23 and, in response, conclude that a contract requiring a party to pay a physician a fee for medico-legal expert services and/or medical treatment that is contingent on the outcome of litigation is contrary to public policy in this state and therefore void. We also conclude that under the facts of this case, payment for the physician's expert services and/or medical treatment pursuant to a theory of quantum meruit is not appropriate.

## BACKGROUND

---

[1] "The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 23, § 1.

On June 21, 1990, the defendant, Robert G. Harris, a resident of Mississippi, was injured in an automobile accident occurring in Louisiana and subsequently filed a lawsuit against several defendants in connection with the accident. Harris went to the plaintiff, Dr. Greg Swafford of Memphis, Tennessee, for treatment of a cold and his injuries.

The injured Harris and the physician Swafford entered into two contractual agreements. The first was an oral agreement between Harris and Dr. Swafford whereby Dr. Swafford would act as medico/legal consultant and assist with the preparation of Harris's personal injury suit in return for 15a percent of any monetary recovery received by Harris. The agreement was reduced to writing on April 16, 1995.

The second agreement, entitled "Medical Reports and Doctor's Lien," was entered into in August of 1994. This agreement, which was signed by Harris and his attorney, Darrell Ryland, required Ryland to pay Dr. Swafford any money owed to him for medical services provided to Harris. This agreement, according to the District Court's order of certification, was not contingent on the outcome of the personal injury litigation.

In preparation for the trial, Dr. Swafford testified at one deposition relating to Harris's personal injury claim and also, according to the complaint, provided medical consultation, treatment, and services. When Harris's personal injury claim settled for $625,000, Dr. Swafford demanded 15a percent as provided in the first contract. When he was not paid, Dr. Swafford filed suit for breach of contract against Harris and his attorney Ryland, as well as a suit for inducement to breach a contract against Ryland. The suit was subsequently removed to the United States District Court for the Western District of Tennessee.

The parties dispute the nature of the contractual agreements. Harris and Attorney Ryland contend that the agreement for medico-legal services was a contingency fee contract, while the agreement for medical treatment was not a contingency fee contract. Dr. Swafford, on the other hand, argues that the contingency fee contract included medico-legal services as well as medical treatment services. He also contends that if the contingency fee contract is unenforceable, he is entitled to recovery under a quantum meruit theory.

The District Court, finding that a response to the questions of law set forth above would "substantially dispose" of the case, certified the questions to this Court pursuant to Rule 23 of the Tennessee Supreme Court. We agreed to review these important questions of first impression.

**CONTINGENCY FEE FOR CONSULTING AND EXPERT TESTIMONY**

The defendants, Harris and his attorney Ryland, relying on extensive authority in Tennessee and elsewhere, contend that a contingency fee contract for the expert services of a physician is contrary to sound public policy and void. Dr. Swafford, although not challenging this authority, contends that "at the time of contracting, there was no existing law in Tennessee, and no guidelines applicable to him, which [gave] notice [of] any public policy against contingency fee contracts."

We begin our analysis by determining whether the contingent fee contract violated existing Tennessee public policy and if so, how such policy was established.

We first examine the American Medical Association Code of Ethics, § 6.01, which condemns contingency fees for the provision of medical services:

-4-

Contingent Physician Fees: If a physician's fee for medical services is contingent on the successful outcome of a claim, such as a malpractice or worker's compensation claim, there is the ever present danger that the physician may become less of a healer and more of an advocate or partisan in the proceedings. Accordingly, a physician's fee for medical service should be based on the value of the service provided by the physician to the patient and not on the uncertain outcome of a contingency that does not in any way relate to the value of the medical service.

Similarly, although the Code of Ethics recognizes that "as a citizen and as a professional with special training and experience, the physician has an ethical obligation to assist in the administration of justice," it again prohibits the use of a contingency fee by a medical witness:

[t]he medical witness must not become an advocate or a partisan in the legal proceeding. The medical witness should be adequately prepared and should testify honestly and truthfully. The attorney for the party who calls the physician as a witness should be informed of all favorable and unfavorable information developed by the physician's evaluation of the case. It is unethical for a physician to accept compensation that is contingent upon the outcome of litigation.

American Medical Association Code of Ethics, § 9.07 (emphasis added).

The AMA Code has been adopted as a regulatory policy by the Tennessee Board of Medical Examiners, the Tennessee statutory agency charged with the licensing and supervision of physicians in this jurisdiction. The Board of Medical Examiners has the statutory responsibility and authority to deny, suspend, or revoke a license for, among other things, "unprofessional, dishonorable or unethical conduct." Tenn. Code Ann. §63-6-214(b)(1)(1997).[2]

---

[2] Relying on these provisions, the Tennessee Medical Association, proceeding as amicus curiae, asserts that the contingency fee contracts used for medical services or medical-legal consulting are void as against public policy. It further asserts that the harm in such contracts is that the inherent pecuniary interest diverts the physician's attention from the paramount interest of providing quality health care.

Accordingly, a violation of the AMA Code constitutes unprofessional conduct and violates public policy established by the Tennessee Board of Medical Examiners.

The Supreme Court, under its inherent and statutory authority, governs the admission and discipline of attorneys in this State. See, e.g., Dockery v. Bd. of Professional Responsibility, 937 S.W.2d 863 (Tenn. 1996). The Code of Professional Responsibility and Disciplinary Rules governing the conduct of attorneys are a part of the Rules of the Supreme Court. Tenn. Sup. Ct. R. 8. Disciplinary Rule 7-109(C) of the Code of Professional Responsibility provides that a lawyer "shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of a case." (Emphasis added). Similarly, ethical consideration 7-28 provides:

> Witnesses should always testify truthfully and should be free from any financial inducements hat might tempt them to do otherwise. A lawyer should not pay or agree to pay a non-expert witness an amount in excess of reimbursement for expenses and financial loss incident to being a witness; however, a lawyer may pay or agree to pay an expert witness a reasonable fee for services as an expert. But in no event should a lawyer pay or agree to pay a contingent fee to any witness. . . .

(Emphasis added). In our view, these provisions of the Code of Professional Responsibility, promulgated by the Supreme Court and authorized by the Tennessee Constitution and statutes, reflect public policy, just as it is reflected in the American Medical Association Code of Ethics. See, e.g., Spiegel v. Thomas, Mann & Smith, P.C., 811 S.W.2d 528, 531 (Tenn. 1991)(holding that a contract which violated sections of the Code of Professional Responsibility was "void as against the public policy of Tennessee.").

Accordingly, the medical and legal communities share the ethical prohibition against the use of contingency fees for expert witnesses which is contained in the respective professional codes for each profession and adopted by the State as the public policy of Tennessee. This public policy is re-enforced by the actions of the Tennessee Bar Association and the Tennessee Medical Association in adopting the Interprofessional Code of Cooperation, which provides in part that "[u]nder no circumstances may a physician charge or accept compensation for any service which is contingent upon the outcome of a lawsuit." Article VI, § 2.

Courts from other jurisdictions have likewise relied upon professional codes in concluding that contingency fees for expert medical witnesses are unenforceable as against sound public policy. For example, in Dupree v. Malpractice Research, Inc., 445 N.W.2d 498 (Mich. Ct. App. 1989), contracts were executed whereby the defendant, Malpractice Research, Inc., provided expert testimony and advice in connection with the plaintiff's medical malpractice action in exchange for payment of costs and 20% of the plaintiff's recovery. The Court of Appeals, citing professional codes in the medical and legal professions, ruled that the contracts were against public policy because they "threaten[ed] the legitimate recoveries of injured plaintiffs" and "imperil[ed] defendants and the fundamental truth-seeking mission of our court system." Id. at 502. The Court also reasoned:

> The [expert's] interest in the amount of the damages furnished a powerful motive for exaggeration, suppression, and misrepresentation, a temptation to swell the damages so likely to color his testimony as to be inimical to the pure administration of justice, and therefore invalid.

Id. (quoting, Sherman v. Burton, 165 Mich. 293, 130 N.W. 667 (1911)).

In a New Jersey case, Polo v. Gotchel, 225 N.J. Super 429, 542 A.2d 947 (1987), the plaintiffs contracted with a "medical-legal consulting service" that was to locate medical experts to provide opinions and testimony as to medical aspects of the plaintiff's malpractice suit. In return, the defendant was to receive a contingency fee of 6 percent of the plaintiff's gross recovery. In deciding the enforceability of the contract, the New Jersey Supreme Court considered the AMA Code of Ethics provisions that condemn contingency fees, a New Jersey statute that prohibited the use of contingency fees by physicians, and sections of the Code of Professional Responsibility that prohibit an attorney from sharing a contingency fee with a non-lawyer. After observing that the 6 percent fee invaded the plaintiff's right of recovery and that the defendant's service would not exist but for the participation of doctors, the Court concluded that the contract was void as against public policy. Id. at 948-49.

Similar public policy concerns have been emphasized by courts and commentators with regard to contingency fee contracts with other types of experts as well. For example, in Belfonte v. Miller, 212 Pa. Super. 508, 243 A.2d 150 (1968), the court invalidated a 10 percent contingency fee for the services of a real estate appraiser, stating that "improper conduct or bias can be predicted easily when the compensation of the witness is directly related to the absolute amount of an award which may in turn be dependent to a great degree on the testimony of that same witness." Id. at 153; see also New England Telephone and Telegraph Co. v. Board of Assessors, 392 Mass. 865, 468 N.E.2d 263, 265 (1984)("the majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of the controversy."); Restatement of Contracts §552(2)("a bargain to pay an expert witness for testifying to his opinion. . . is illegal. . .if the agreed compensation is contingent on the outcome of the controversy."); cf. Ojeda v. Sharp Cabrillo

<u>Hospital</u>, 8 Cal. App. 4th 1, 10 Cal. Rptr. 2d 230 (1992)(contingency fee contract with medical consulting service not <u>per</u> <u>se</u> void).[3]

Given this overwhelming weight of authority, we disagree with Dr. Swafford's contention that no controlling public policy existed or that the public policy was not applicable simply because he is not a member of the American or Tennessee Medical Associations. On the contrary, it is our view that sound public policy in this jurisdiction, as in others, is crystal clear: a contingency fee contract for the services of a physician acting in a medico-legal expert capacity is void as against public policy and therefore unenforceable.

## CONTINGENCY FEE FOR MEDICAL TREATMENT

Much of the foregoing authority and discussion is pertinent to the issue of a contingency fee for medical treatment as well. In particular, the <u>American Medical Association Code of Ethics</u>, § 6.01, emphasizing "the ever present danger that the physician may become less of a healer and more of an advocate or partisan," states that a "physician's fee for medical services should be based on the value of the service provided by the physician to the patient and not on the uncertain outcome of a contingency that does not in any way relate to the value of the medical service."

The prohibition in the <u>American Medical Association Code of Ethics</u>, which has been adopted by the Tennessee Board of Medical Examiners, is a clear reflection of public policy. As the New Jersey Supreme Court said in <u>Polo v. Gotchel</u>, <u>supra</u>,

---

[3] We note that a few commentators, while acknowledging the legitimate public policy goals of the majority rule against contingency fee contracts for experts, have proposed alternative arrangements based on the competing policy of providing expert services for litigants who may not otherwise be able to afford expert services . <u>See</u> J. Parker, <u>Contingent Expert Witness Fees: Access and Legitimacy</u>, 64 S. Cal. L. Rev. 1363 (1991)(proposing contingency fee based on hours worked rather than amount of plaintiff's recovery); Note, <u>Contingent Fees for Expert Witnesses in Civil Litigation</u>, 86 Yale L.J. 1680 (1977)(proposing extensive court supervision of contingency fee contract).

> Section 8.04 . . . This section clearly enunciates the public policy that doctor's fees should not be based on an uncertain outcome of a contingency, the underlying public policy being the danger of the physician becoming more of an advocate and less of a healer. A doctor's fee should be calculated only on the value of the medical services provided, in accordance with accepted standards of fee payment for services rendered.

542 A.2d at 948 (emphasis added).

The same public policy is contained in the Interprofessional Code of Cooperation adopted by the Tennessee Medical Association and the Tennessee Bar Association, which states that under no circumstances may a physician receive a contingency fee "for any service." Article VI, § 2. Simply put, contingency fees for medical services not only imperil the sanctity of the doctor/patient relationship but also create the potential that pecuniary interests may influence professional judgment.

In this case the contracts indicate that the parties contemplated the legal action and also Dr. Swafford's role in the proceedings. With the financial incentives already in place, it is immaterial whether the contingency fee contract was for medico-legal expert services and/or for medical treatment. Under the authority discussed above, a contingency fee for either is against sound public policy and therefore void and unenforceable.

**QUANTUM MERUIT**

We turn to the third and final question certified for our review. Dr. Swafford contends that if contingency fee contracts for the services of a physician are unenforceable, he is entitled to receive payment for the services rendered under a theory of quantum meruit. The defendants, Harris and his

attorney Ryland, argue that a quantum meruit recovery is not appropriate where the underlying contract is void as against public policy.[4]

A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:

> 1. There is no existing, enforceable contract between the parties covering the same subject matter;
>
> 2. The party seeking recovery proves that it provided valuable goods or services;
>
> 3. The party to be charged received the goods or services;
>
> 4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
>
> 5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Castelli v. Lien, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995); see Paschall's, Inc. v. Dozier, 219 Tenn. 45, 54, 407 S.W.2d 150, 154 (1966).

With regard to the first factor, we observe that the parties dispute the scope of the contingency fee contract. Harris and Attorney Ryland contend it was solely for medico-legal expert services and that a separate, non-contingency fee agreement existed for the medical treatment. Dr. Swafford, on the other hand, contends that the contingency fee contract included expert services and medical treatment and that, if void, he is entitled to quantum meruit recovery for both.

---

[4] The Tennessee Medical Association, proceeding as amicus curiae, agrees that a recovery under quantum meruit is not appropriate under the facts of this case.

We need not dwell on this factual dispute because our decision with respect to recovery under quantum meruit rests principally upon the fifth factor. Although we have not addressed this issue before under these circumstances, we have held on at least one prior occasion that quantum meruit was not available where the underlying contract was found void as against public policy. For example, in White v. McBride, 937 S.W.2d 796 (Tenn. 1996), a contract provided that an attorney would receive a contingency fee plus a $2,500 retainer. The trial court found that the contingency fee was clearly excessive in relation to the work performed by the attorney in violation of Code of Professional Responsibility, Disciplinary Rule 2-106, but awarded the attorney $12,500 based on quantum meruit. We held that although attorneys should not be unfairly penalized for innocent errors in drafting that might render a contract unenforceable, the violation of Disciplinary Rule 2-106 was "an ethical transgression of the most flagrant sort as it goes to the heart of the fiduciary relationship that exists between attorney and client." Id. at 803. We therefore reversed the trial court's award of quantum meruit.

The Michigan Court of Appeals reached a similar conclusion with respect to a contingency fee contract for physician services in Dupree, supra. After holding that the contingency fee contract was void as against public policy, the court said:

> While it is not necessarily the case that quantum meruit is an inappropriate consideration where the underlying contract is void as against public policy, where a contract violates strong, established public policies quantum meruit will not be given in aid of or to encourage unprofessional conduct infringing the integrity of judicial proceedings. In this case, we find contingent fee contracts of the type at issue so repugnant to established. . .public policy, as expressed by statutes, court rules, and court opinions, that to permit recovery on a quantum meruit basis would defeat or subvert those policies and threaten the integrity of the judicial system.

445 N.W.2d at 500 (emphasis added; citations omitted).

In our view, White and Dupree are applicable in this case. The contingency fee contract for physician services is expressly prohibited by both the American Medical Association Code of Ethics and the Tennessee Code of Professional Responsibility. For the reasons previously discussed, the violation not only subverts the doctor/patient relationship but also converts Dr. Swafford into a partisan with an economic interest in the outcome. Swafford's principal defense on appeal is that he was either unaware of the ethical provisions or did not belong to the organizations that promulgate the provisions--an explanation tantamount to suggesting he is subject to no public policy or regulatory authority whatsoever. We conclude that allowing quantum meruit under these circumstances would undermine and subvert strong public policies established to prohibit unprofessional conduct which affects the integrity of the judicial process and the administration of justice.

## CONCLUSION

Based on the foregoing authority and discussion we conclude that a contract requiring a party to pay a fee for medico/legal expert services and/or medical treatment that is contingent on the outcome of litigation is against public policy and unenforceable. We also conclude that a quantum meruit recovery is not appropriate under the facts of this case.

Costs of this appeal are taxed to the plaintiff, Dr. Greg Swafford, for which execution may issue if necessary.

_____
RILEY ANDERSON, CHIEF JUSTICE

-13-

**CONCUR:**

Birch, Drowota, Reid, and Holder, JJ.