[No. D012726. Fourth Dist., Div. One. July 16, 1992.]

FRANCES R. OJEDA, a Minor, etc., Plaintiff and Respondent, v.
SHARP CABRILLO HOSPITAL, Defendant;
MEDICAL QUALITY FOUNDATION, Movant and Appellant.

**COUNSEL**

Olins, Foerster & Siegel, Dennis J. Hayes and Douglas F. Olins for Movant and Appellant.

No appearance for Plaintiff and Respondent.

Sparber, Ferguson, Naumann, Ponder & Ryan, William H. Naumann and Daniel F. Morrin as Amici Curiae upon the request of the Court of Appeal.

Horvitz & Levy, S. Thomas Todd, David S. Ettinger, Hassard, Bonnington, Rogers & Huber, David E. Willett, Greines, Martin, Stein & Richland, Martin Stein, Robert A. Olson, Donald B. McCaw, Kurt W. Melchior, Jerome Sapiro, Jr., Miller, Ewald, Monson, Hoshaw & Schechter and Timothy P. Kindelan as Amici Curiae.

## OPINION

**WIENER, J.**—As modern litigation becomes increasingly complex, lawyers are routinely called upon to obtain, understand and utilize specialized expertise in order to effectively evaluate and litigate cases. When lawyers do not possess the expertise themselves, they must seek out others for assistance.

This appeal concerns how such expert assistance may properly be compensated. Can a plaintiff in a medical malpractice case validly contract with a medical-legal consulting service to assist the plaintiff's attorney where the consideration for these services is a contingent fee calculated as a percentage of the plaintiff's ultimate recovery? In the context of reviewing the compromise of a minor plaintiff's claim, the trial court concluded such a contract is automatically invalid. We disagree. As we shall explain, however, California's statutory limitations on attorney fees in medical malpractice cases requires that the plaintiff's arrangement with both the consulting service and the lawyers be closely scrutinized to ensure that the consulting contract does not subvert the legislative scheme. We accordingly reverse the superior court's order disapproving the contract and remand for further proceedings consistent with this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Frances R. Ojeda suffered severe birth defects including cerebral palsy during her birth at defendant Sharp Cabrillo Hospital in 1982. On her behalf, Frances's mother, Concepcion Ojeda, sued the obstetrician who performed the delivery, recovering a settlement which was to be held in trust for Frances. After consulting with another attorney, Concepcion concluded a second action on behalf of her daughter should be brought against the hospital. Not wishing to use the proceeds of the first settlement to defray the costs of the second suit, Concepcion entered into a contract with the Medical Quality Foundation (the Foundation) to assist Frances's attorney with the preparation of her case against the hospital. If an initial consultation report for a fee of $150 were favorable, the Foundation agreed to review relevant medical records and locate expert witnesses to testify on Frances's behalf. In return, Concepcion promised to pay the Foundation 20 percent of any

recovery Frances received. The experts were to be separately compensated at a prearranged flat rate paid by the Ojedas, presumably with sums advanced by Frances's attorneys.[1] The attorneys also signed the contract. They promised to pay the Foundation in accordance with its terms. They further agreed that in later cases they would not contact any expert identified by the Foundation without the Foundation's written permission.[2]

On Concepcion's ex parte application shortly after the contract was executed, the superior court (per Judge Wagner) approved the arrangement. Over the next 28 months, the Foundation reportedly performed 170.5 hours of work in connection with the Ojeda case.[3] In early 1990, the case was settled for $1.1 million. Although contractually entitled to $220,000, the

---

[1] Because our focus is on the facial validity and enforceability of the contract, we do not dwell at length on what are apparent inconsistencies between the contract terms and the way in which the Foundation experts were compensated in this case. For instance, the contract indicates that the fee for expert services is $75 per hour with certain minimums and that the client must pay this fee to the Foundation in advance. Yet documents submitted in conjunction with a stipulation in this court show that at least one Foundation medical expert was compensated at a rate of $400 per hour for certain consultations and was paid this amount directly by Ojeda's lawyers.

In addition, the contractual notion of the Foundation as a mere "finder" of independent experts separately compensated by the party is questionable. Materials submitted by the Foundation to the trial court list the services of four medical experts in terms of numbers of hours and make a quantum meruit claim for these services at a rate of $250 per. hour. Despite our attempt to obtain a factual stipulation from the parties, it remains unclear whether these services overlap those separately compensated by Ojeda's attorneys, whether the four experts were ever paid by the Foundation and if so in what amount. We have necessarily assumed that any consulting/testifying experts are not employees of the Foundation, yet we do not understand how the Foundation can claim compensation for an independent expert's services unless it is requesting reimbursement of sums previously paid to the expert.

Suffice it to say that the manner of compensation of the experts in this case is far from clear. Our decision on the facial validity of the contract should in no way deter the trial court from assessing the true amounts and sources of expert compensation. To the extent these differ from the terms of the contract, the court may determine whether the deviation renders the contract unenforceable.

[2] A copy of the Foundation contract is attached as an appendix. Needless to say, our discussion of the contract and certain of its terms should not be viewed as an approval of the contract in other contexts or of other contractual provisions not at issue here. In particular, the Foundation has argued the case as though California law applies to determine its validity despite a choice of law/forum selection clause in the contract stating that Virginia law should apply. In these circumstances, we have no occasion to express an opinion on the validity of that clause.

[3] We note that this figure includes 104 hours of services allegedly performed by 4 medical experts located by the Foundation and the record before this court fails to establish whether and the extent to which these experts were compensated by the Foundation as opposed to being separately compensated by Ojeda's trial lawyers. In evaluating the services performed by the Foundation (see *post*, fn. 21), it will be for the trial court to determine whether the experts were compensated by the Foundation, by Ojeda or in some combined fashion and indeed whether the Foundation may properly treat the 104 hours as *Foundation* services. (See *ante*, fn. 1.)

Foundation agreed to accept $125,000 for its services. Concepcion applied for a court order approving the minor's compromise including the payment of $151,666 in attorney fees, an additional $27,528 to the attorneys as reimbursement for costs and $125,000 to the Foundation. Drawing upon his extensive judicial experience and legitimate concern for the minor, Judge Tharp approved the funds for the attorneys but declined to allow payment to the Foundation, concluding the contingency fee contract was "unlawful, unethical, violative of the laws of the State of California regulating the practice of law, contrary to public policy, and contrary to the best interests of the minor . . . ."

On appeal, the Foundation contends it should receive the $125,000 it requested based on the contingency fee agreement signed by Concepcion Ojeda and previously approved by the superior court.[4] Alternatively, the Foundation argues even if the contract is unenforceable, it is entitled to a quasi-contractual recovery based on the reasonable value of its services. We reverse for further proceedings consistent with this opinion.

## DISCUSSION

When we initially considered the Foundation's appeal, we expressed concern with the nonadversarial nature of the case. The ex parte appeal by the Foundation followed ex parte proceedings in the trial court. At least in terms of this case, the hospital—the adversary in the underlying proceedings —was unaffected by how the $1.1 million settlement is divided and was not a party to the appeal. Concepcion Ojeda—the minor's guardian with a clear interest in maximizing the child's recovery—did not challenge the Foundation's request, presumably because it was she who entered into the original contingent fee contract. The minor's trial attorneys, as we later explain, were and are faced with several conflicting interests. In any event, they would not be permitted to challenge the Foundation's request without the guardian's approval.

Attempting to augment the limited ex parte presentation we had received, we sent a copy of the Foundation contract to four legal organizations, including the State Bar of California, and invited their comment on the issues raised by the case. None responded to our request. We proceeded to decide the case, acutely aware of our institutional limitations and cautious that we not exceed them. Our first opinion solicited comment from interested

---

[4]The Foundation makes no contention that Judge Tharp's order was an improper attempt to overrule Judge Wagner's earlier order approving the contract (see, e.g., *Wyoming Pacific Oil Co. v. Preston* (1958) 50 Cal.2d 736, 739 [329 P.2d 489]) and we accordingly express no opinion on the issue.

persons and organizations which we could consider in deciding whether to grant rehearing on our own motion.

Three organizations and groups of individuals responded to our invitation: (1) the County of Los Angeles, in its capacity as a provider of medical services, argued that the trial court was correct in concluding that contingent fee consulting contracts are per se invalid; (2) a joint brief by the California Medical Association, the California Association of Hospitals and Health Systems, and the California Dental Association (collectively the Medical Associations) expressed no opinion on the facial validity of the contract but argued, assuming such contracts are valid, that the opinion should make clear certain services performed by the Foundation are not separately recoverable from the clients as "costs" in addition to the amount paid as attorney fees; and (3) three individual attorneys interested in professional ethics but not practicing in the field of medical malpractice provided comments generally supportive of the approach taken in the opinion but raising questions or offering suggestions about several specific topics. Based on these submissions, we decided to grant rehearing on our own motion to more fully consider the additional arguments and we accorded the three groups amicus curiae status. We later received additional responsive briefs filed by the Foundation, Ojeda's trial lawyers, Sparber, Ferguson, Naumann, Ponder & Ryan (hereafter Sparber Ferguson) and by the minor's coguardians Concepcion Ojeda and the Bank of California.

Although it may not have always been the intent, the effect of these six postopinion submissions has been to convince us of the limited nature of our role. Frankly, this case raises a myriad of complex and challenging issues regarding the cost of prosecuting a civil lawsuit generally and a medical malpractice action specifically, and the appropriate measure of compensation for persons involved in that process. It would be fascinating to see empirical data developed to compare the desirability of various compensation and financing schemes. But our function is not to determine the desirability or wisdom of contingent fee consulting contracts. We must apply existing law to determine whether and how the contract in this case can be enforced. Many of the arguments made by the groups who oppose contingent fee consulting contracts are more appropriately made to the Legislature, which could ban such contracts outright, or the State Bar, which could propose a rule of professional conduct prohibiting lawyers from recommending that their clients enter into such contracts. While we suspect that the limitations we articulate based on current law may negatively impact the practicality of these sorts of arrangements, we would certainly encourage the continuation of the debate in other forums where the broader issues can be addressed.

## I

The subject of fees and costs in California medical malpractice actions is comprehensively regulated by statute. ▋ Generally, an attorney may charge a fee contingent on the success of the action and may calculate the fee as a percentage of the ultimate recovery, subject only to the general requirement that the fee not be "unconscionable" or "unreasonable." (See Cal. Rules Prof. Conduct, rule 4-200; ABA Model Rules Prof. Conduct, rule 1.5 (a) and (c); *Cazares* v. *Saenz* (1989) 208 Cal.App.3d 279, 287-288 [256 Cal.Rptr. 209].) Business and Professions Code section 6146, however, enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA), limits the contingent fee an attorney may charge for representing a client in an action based on the professional negligence of a health care provider.[5] It also specifies that the various statutory percentages are to be calculated after deducting the "disbursements or costs incurred in connection with prosecution or settlement of the claim." (§ 6146, subd. (c)(1).) There is, thus, a necessary relationship between expenses properly characterized as costs and the amount of attorney fees the client may be legally charged.

The line between "costs" and attorney overhead included as part of the lawyer's fee is an undefined and changing one. Traditionally, the costs associated with a lawsuit have included items such as transcript, filing, service and jury fees and hourly compensation paid to experts who serve as witnesses or consultants.[6] (See, e.g., Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 1990) ¶ 1:176.) Increasingly, lawyers are attempting to expand their ability to recoup certain expenses, such as travel, postage, photocopying, word processing and computer research charges. (See Pickus, Fee Agreement Forms Manual (Cont.Ed.Bar 1989) com. to § 1.14, p. 18; 1 Cal. Attorney Practice (1990) § 10.21[5][b], p. 10-64.22.)

---

[5]At the time the attorney fee contract in this case was entered into, subdivision (a) of section 6146 provided: "An attorney shall not contract for or collect a contingency fee for representing any person seeking damages in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence in excess of the following limits: [¶] (1) Forty percent of the first fifty thousand dollars ($50,000) recovered. [¶] (2) Thirty-three and one-third percent of the next fifty thousand dollars ($50,000) recovered. [¶] (3) Twenty-five percent of the next one hundred thousand dollars ($100,000) recovered. [¶] (4) Ten percent of any amount on which the recovery exceeds two hundred thousand dollars ($200,000). [¶] Such limitations shall apply regardless of whether the recovery is by settlement, arbitration, or judgment, or whether the person for whom the recovery is made is a responsible adult, an infant, or a person of unsound mind." (Stats. 1975, 2d Ex. Sess., ch. 2, § 1.185, p. 3989.)

[6]On this subject, subdivision (c)(1) (formerly subd. (d)(1)) of section 6146 also provides that the "[c]osts of medical care incurred by the plaintiff and the attorney's office-overhead costs or charges are not deductible disbursements or costs for such purpose."

However defined, plaintiffs' personal injury attorneys routinely advance such costs to the client, often making repayment contingent on a successful outcome. (See Cal. Rules Prof. Conduct, rule 4-210.) All other things being equal, we assume a lawyer willing to advance costs and accept only contingent repayment will have to charge a higher fee than one who requires the client to pay all costs as they are incurred.[7]

Clearly the MICRA fee limitations have restricted the ability of lawyers to charge higher fees. Some suggest they discourage higher quality lawyers from agreeing to represent malpractice victims. (See *Roa* v. *Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 930; *id.* at pp. 935-936 [211 Cal.Rptr. 77, 695 P.2d 164] (dis. opn. of Bird, C. J.).) Thus lawyers faced with the generally rising cost of doing business or desiring to increase their profitability may focus on the retention of expert consultants as an area where expenses can be reduced. The Foundation's contingent fee consulting contract attempts to accomplish this result by transferring what are essentially finance costs and the risk of failure from the lawyer and/or client to a third party, in this case the consulting expert. As in the case of contingent attorney fees, we would expect that in any given case, a contingent consulting fee would result in higher compensation than the consultant's standard hourly fee. (See *Cazares* v. *Saenz*, *supra*, 208 Cal.App.3d at pp. 287-288.)

The trial court's decision in this case invalidating the Foundation's contract presents several levels of inquiry. First, are such contingent fee contracts per se invalid as a violation of public policy? If not, do considerations peculiar to the facts of this case make this contract unenforceable? Finally, are there additional factors a court may review in determining the enforceability of such a contract as against a minor plaintiff?

## II

The trial court in this case did not specify on what basis it concluded the Foundation's contract was unenforceable. In recent years, however, the propriety of similar contingent fee consulting contracts has been discussed in the ethics opinions of various state and national bar associations.

The American Bar Association's Committee on Ethics and Professional Responsibility rendered such an opinion in 1976. Informal opinion No. 1375 involved a contract between a "medical-legal consulting service" (M) and a

---

[7]An advanced understanding of microeconomics is not required to appreciate that delay in reimbursement and the risk of nonreimbursement are costs the lawyer must recoup as part of the fee.

client (C) also signed by the client's lawyer (L). (ABA Formal and Informal Ethics Opinions (1985) p. 259.) Analyzing the lawyer's obligations consistent with the then-existing ABA Code of Professional Responsibility, the committee concluded:

"Nothing in the Code . . . proscribes a lawyer from recommending that a client contract with a lay person on a contingent fee basis so long as: (1) the lay person or agency is not to engage in the unauthorized practice of law . . . ; (2) the lawyer does not share legal fees with the lay person, or agency . . . ; and (3) the contingent fee is not payable for the testimony of the lay person or agency . . . . [¶] Assuming that M's services do not constitute the unauthorized practice of law and that no testimony from M's employees or agents was contemplated in the contract for M's services, we perceive no obvious violation of the Code by L in cooperating with M in connection with C's claim." (*Op. cit. supra*, at p. 260.)

The American Bar Association informal opinion served as a sort of model for several state bar ethics opinions addressing similar issues. Characteristic of these is Formal Opinion No. 1984-79 by the California State Bar's Standing Committee on Professional Responsibility and Conduct. (Cal. Compendium on Prof. Responsibility (1991) at p. IIA-242 (hereafter cited as Cal. Opn. 1984-79).) The committee was asked to review the "ethical considerations for members of the State Bar who are considering permitting their clients to enter into contractual arrangements with firms which offer the service, on a contingent fee basis, of providing expert medical consultation and of locating and providing expert testimony[.]" (Cal.Opn. 1984-79.) The opinion begins by identifying three ethical prohibitions such a contractual arrangement might violate: (1) a contingent fee cannot be paid for the testimony of a witness (see rule 5-310(B)); (2) a lawyer may not share legal fees with a layperson (rule 1-320(A)); and (3) a lawyer may not assist a layperson in the unauthorized practice of law (see rule 1-300(A)). It concludes by stating that while "the arrangement by its nature may place considerable pressure on the participants, particularly, the Consulting Service and the experts it retains, to operate in a fashion which could result in involving the attorney either directly or indirectly in unethical conduct," a contingent fee consulting contract "*is not per se violative of the Rules of Professional Conduct . . . .*" (Cal.Opn. 1984-79, at p. IIA-245, italics added.)

Focusing on most or all of the same considerations, other state bar associations have reached similar conclusions. The State Bar of Georgia approved the concept noting, "[F]or some clients, an arrangement similar to that proposed may be the only means available to retain the services of an expert to pursue a cause of action." (State Bar of Ga., Advisory Opn. No. 48

(1985) typed opn. p. 3; see also Conn. Bar Assn. Com. on Prof. Ethics, Informal Opn. No. 82-7 (1981); D.C. Bar Legal Ethics Com., Opn. No. 55 (1978) (hereafter cited as D.C. Opn. No. 55); State Bar of Ariz., Opn. No. 84-9 (1984); Ind. State Bar Assn. Legal Ethics Com., Opn. No. 1 (1981).)

A somewhat different fact-specific approach was evidenced in 1987 when the American Bar Association issued formal opinion No. 87-354, superceding informal opinion No. 1375. (ABA/BNA Lawyers' Manual on Prof. Conduct (Bur.Nat.Affairs 1990) p. 901:107 (hereafter cited as ABA Formal Opn. 87-354).) Acknowledging the answer "may depend on the circumstances and arrangements in a particular case," the Committee on Ethics and Professional Responsibility concluded with respect to the specific contingent fee consulting contract before it that the lawyer's conduct in recommending the contract to a client "may violate the Model Rules." The opinion noted concerns in four areas. First, to the extent the consulting service performs work traditionally done by lawyers, the reasonableness of the lawyer's contingent fee is called into question unless it has been reduced. Second, to the extent the consultant's services are not normally performed by the lawyer (i.e., traditional "cost" items), the Committee expressed concern that experts regularly retained by the service—although not paid for their testimony on a contingent fee basis—have a strong financial incentive to testify consistent with the consulting service's interests. Third, the opinion referred to a provision of the consulting contract which prohibits the lawyer from contacting experts whose names have been provided by the consulting service without the service's prior consent. The committee suggested that the lawyer might violate his professional obligations to later clients by agreeing to be bound by such a restriction. Finally, again referring to the specific provisions of the contract before it which provided for payment of the expert witness fees by the consulting service, the committee suggested the arrangement might be champertous under applicable state law,[8] in which case the lawyer should not recommend the contract to the client. (See also Colo. Bar Assn. Ethics Com., Opn. No. 77 (1988); State Bar of Mich. Com. on Prof. and Jud. Ethics, Opn. No. C-240 (1988).)

Of course, the issue before us is not the same as that considered by the ethics committees of the various bar associations noted above. Our function is to determine whether the Foundation's contingent fee contract with Ojeda

---

[8]The champerty issue does not arise in this case because the expert witnesses' fees were paid directly by Ojeda, not the Foundation. Indeed, as far as we are aware, the Foundation typically advances no sums to the client to assist in the prosecution of the lawsuit. The contingent fee is solely compensation for services provided by the Foundation.

can be enforced, not whether Ojeda's lawyers acted in a professionally responsible manner.[9]

The three reported cases cited to us which have addressed such an issue within the last fifty years have reached inconsistent conclusions.[10] In *Schackow v. Medical-Legal Consulting Service, Inc.* (1980) 46 Md.App. 179 [416 A.2d 1303, 15 A.L.R.4th 1239] the medical malpractice client entered into a contract with a consulting service but the lawyer was dissatisfied with the assistance he received and refused to pay the service the 10 percent contingency fee at the conclusion of the case. When the lawyer was sued by the service, he defended on the ground, among others, that the contingent fee contract was void as against public policy. The court, however, rejected the contention. (*Id.* at pp. 1312-1313.) Interestingly, the opinion relied on several older cases which had approved arguably similar arrangements. (See, e.g., *Barnes v. Boatmen's Nat. Bank of St. Louis* (1941) 384 Mo. 1032 [156 S.W.2d 597, 602] [lawyer on behalf of client entered into contingency fee contract with psychiatrist to consult with lawyers and testify at trial]; *Haley v. Hollenback* (1917) 53 Mont. 494 [165 P. 459] [plaintiff entered into contingency fee contract with layperson to locate relevant evidence for upcoming trial].)

In *Polo by Shipley v. Gotchel* (1987) 225 N.J.Super. 429 [542 A.2d 947], the court determined that a similar contingent fee consulting contract was inconsistent with "the prevailing court rules, statutes, and public policy of the State of New Jersey." (*Id.* at p. 948.) The opinion places particular reliance on section 8.04 of the Current Opinions of the Judicial Council of the American Medical Association, 1984 (now § 6.01 of the Current Opinions of the Council on Ethical and Judicial Affairs—1989), which states that a physician's "fee for medical services" should be based on the value of the

---

[9]We are indeed concerned that the contractual provision which precludes a lawyer from contacting an expert appearing on a consulting service's list may improperly restrict the exercise of his or her professional judgment in a later case. The validity of that provision, however, is not before us and we decline to decide the issue. In any event, the fact that such a provision might be unenforceable against the lawyer in the later proceeding—or even subject a complying lawyer to professional discipline—could not, in our view, affect the enforceability of the contract in this case.

[10]A recent California case tangentially touches a related question but offers little guidance on the precise issue before us. In *Medical Legal Consulting Services, Inc. v. Covarrubias* (1991) 234 Cal.App.3d 80 [285 Cal.Rptr. 559], the plaintiff in a California medical malpractice case refused to pay the expert consulting service the previously agreed upon contingent fee. The consulting service obtained a breach of contract judgment in Maryland (the headquarters of the service) and sought to enforce the judgment in California. The *Covarrubias* court held that the full faith and credit clause of the United States Constitution required enforcement of the Maryland judgment. In doing so, the court noted that the contract did not result in the payment of a contingent fee for expert testimony. (*Id.* at p. 92; see *post*, p. 15.)

service and not be "contingent on the successful outcome of a claim."[11] The court was also persuaded by the fact that the New Jersey Rules of Professional Conduct, which authorize lawyers to charge contingent fees, did not expressly provide that others may contract on a similar basis. (542 A.2d at p. 949.)

*Polo* was followed in *Dupree* v. *Malpractice Research, Inc.* (1989) 179 Mich.App. 254 [445 N.W.2d 498]. In addition to agreeing with the *Polo* reasoning, the *Dupree* court noted the prohibition on compensating witnesses with contingent fees and explained it could discern no difference between witnesses and witness brokers: "The incentive is just as powerful for a middleman whose compensation is tied to the size of a plaintiff's recovery to manufacture favorable testimony through selective procurement of witnesses." (*Id.* at pp. 502-503; but see *post*, fn. 16.)

It could be argued that the rationale of *Polo* and *Dupree* is limited to the specific state rules and statutes of New Jersey and Michigan which are not duplicated in California. However, to the extent those cases more generally conclude that contingent fee consulting contracts are automatically violative of public policy, we are unpersuaded by their reasoning.[12] Indeed, most of the courts and bar associations which have considered the issue appear to have reached an opposite conclusion,[13] while pointing out the aspects of such contracts which may run afoul of specific ethical prohibitions. It is to

---

[11]The full text of current section 6.01 reads as follows: "If a physician's fee for medical service is contingent on the successful outcome of a claim, there is the ever-present danger that the physician may become less of a healer and more of an advocate. Accordingly, a physician's fee for medical services should be based on the value of the service provided by the physician to the patient and not on the uncertain outcome of a contingency that does not in any way relate to the value of the medical service."

[12]For example, *Polo* and *Dupree*'s reliance on the American Medical Association's ethical guidelines is questionable for at least two reasons. First, the consulting service which receives the contingent fee is not a doctor; it is a company which employs doctors as well as other medical professionals. More importantly, the American Medical Association guideline clearly implies that "medical services" refers to treatment of the patient by the doctor and not consulting services provided in conjunction with the services of a lawyer. (See *ante*, fn. 11.) The obvious purpose of the guideline is to deter doctors from accepting payment for treatment services contingent on a patient's recovery from the person who injured him or her.

[13]Focusing on the prohibition against compensating a witness with a contingent fee, two state ethics opinions have determined that contingent fee consulting contracts are necessarily unethical. (See Idaho State Bar Ethics Com., Formal Opn. No. 104 (1981); State Bar of Tex. Prof. Ethics Com., Opn. No. 458 (1988).) The Idaho opinion was superceded eight years later when the committee reached a contrary conclusion. (Idaho State Bar Ethics Com., Formal Opn. No. 128 (1989) (hereafter cited as Idaho Opn. 128).) Employing reasoning similar to *Dupree*, the Texas opinion argues: "It would seem to be the only logical conclusion available, that when you pay a fee based on a percentage of the recovery to a consulting firm providing expert witnesses, in essence you are paying for testimony. Theoretically, the better the testimony, the larger the recovery and hence, the larger the fee to the witness."

Because the Texas opinion does not include a copy of the consulting contract, it is impossible to evaluate the accuracy of the assertion that the *expert witness's* fee is a function

these specific considerations that we now turn to determine whether this particular contract as applied can be enforced.[14]

## III

Of the three areas of concern repeatedly noted in the cases and ethics opinions,[15] two require but minimal discussion. There was no evidence before the trial court to suggest that the Foundation engaged in the unauthorized practice of law. Apparently it assisted the attorneys here as would any other consulting expert: analyzing facts, interpreting complex or technical substantive details and recommending appropriate experts to testify on particular issues. ■ In any event, as the District of Columbia ethics opinion observes, "Many of the various functions performed by lawyers in preparing cases for trial may be performed by others also. As long as the services are not distinctively legal and remain subject to the control of the lawyer who has responsibility for the case, those performing them are not engaged in the unauthorized practice of law." (D.C. Opn. 55, *supra*.)

of the size of the recovery. As we have seen, typically the expert is paid a flat hourly fee; it is the consulting firm which is compensated on a contingent percentage basis. In any event, as we later explain (see p. 15, *post*), we are unwilling to accept the contention that such agreements are per se invalid because the consulting firm is encouraged to locate perjured expert testimony in an effort to enhance its fee.

[14]Amicus curiae County of Los Angeles also argues we should deny enforcement of this contract because the fee charged is unconscionable when compared with the relatively limited obligations assumed by the Foundation under the contract. (See generally *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925-927 [216 Cal.Rptr. 345, 702 P.2d 503]; *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 485-493 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].) In contrast to the public policy issues surrounding contingent fee consulting contracts—on which we have sought comment from interested persons—we are not inclined to consider an argument concerning the unconscionability of this particular contract which was not raised by a party to the contract. Obviously the issue is one which should be considered by plaintiffs when they contemplate signing such a contract and by plaintiffs' lawyers when they advise their clients to do so.

[15]Referring to ABA Formal Opinion 87-354, amicus curiae County of Los Angeles also argues that the contract should be declared invalid because the payment of a large contingent fee to the Foundation, as a practical mater, requires the lawyer to accept the Foundation's choice of experts regardless of their qualifications or the lawyer's opinion of the value of the testimony. We are unpersuaded. First of all, as the Foundation points out, its failure to provide qualified experts to testify might well be viewed as a material failure of consideration which would vitiate the plaintiff's obligations under the contract.

In any event, it must be remembered that the contingent fee is compensation for the *Foundation's* work, not the expert testimony which at least in theory is separately compensated on an hourly basis. (See *ante*, fn. 1.) Where the Foundation provides an attorney with qualified experts to testify but the attorney, for tactical reasons, prefers a different expert, there is no significant economic incentive for the lawyer to choose the Foundation's experts. Rather, as in any case in which a consultant is employed (whether on a contingent or fixed fee basis), the lawyer may question his decision to recommend employment of the consultant and decide not to do so in future cases.

■ There is no suggestion here the attorneys did not retain complete control of the litigation.

Nor do we believe that the contract, in effect, would have provided expert testimony for a contingent fee. To begin with, the case settled before trial so no expert testimony was needed. In any event, the experts who were consulted in anticipation of providing trial testimony were paid by Ojeda on an hourly flat-rate basis and would have been similarly compensated had their testimony been required. As the court explained recently in *Medical Legal Consulting Services, Inc.* v. *Covarrubias, supra*, 234 Cal.App.3d 80, analyzing a similar contract, "[T]here is no evidence that any employee of MLCS ever sought to procure any false testimony on behalf of the minor and the contract explicitly provided that no MLCS employees were to be paid for any expert testimony on a contingency basis. Accordingly, the factual predicate for the minor's guardians' argument, that the contingency arrangement of the present case was calculated to lead to the production of some form of perjured testimony, is without any factual basis . . . ." (*Id.* at p. 92.)

It is true both the American Bar Association and California formal opinions suggest that a consulting service may have a "stable" of experts and that such frequently retained witnesses may thus "be provided with a stake in the outcome of the litigation due to their repeated utilization by the Consulting Service, and their repeated compensation therefor." (Cal. Opn. 1984-79, *supra*, at p. IIA-243; see also ABA Formal Opn. 87-354, *supra*.) We fail to see, however, how this "stake" is any different than that of the expert who is repeatedly retained by a particular lawyer or law firm.[16] While frequent retentions—by a lawyer or consulting service—may harm a witness's credibility, we do not think utilization of such a witness constitutes a violation of the rules of professional conduct.

As for fee splitting, we read the California ethics opinion as stating that the requirements of Business and Professions Code section 6146 make it impossible to utilize a contingent fee consulting contract in a medical malpractice case without violating the fee-splitting prohibition of Rules of Professional Conduct, rule 1-320:

---

[16]As the Ethics Committee of the Idaho State Bar has observed: "[T]here [is] a substantive distinction between an outright contingent fee to a witness and a flat fee to a witness with a contingent fee to the Finder. In the latter scenario, the witness, who receives only a flat fee, is arguably as free from influence as he would be if the attorney had hired him directly, without the services of a Finder. The attorney has the same financial incentive to influence the testimony. The introduction of an intermediary, the Finder, does not intensify or lessen the basic incentive. Thus, where it is proper for an attorney to directly hire an expert, it is fiction to suggest that the presence of a Finder somehow, by itself, taints an otherwise standard facet in the assembly of a lawsuit." (Idaho Opn. 128, *supra*, typed opn. at pp. 4-5; compare *Dupree* v. *Malpractice Research, Inc., supra*, 445 N.W.2d at pp. 502-503.)

"[I]f the fee payable to the Consulting Service is taken in whole or in part from the lawyer's own fee, the arrangement contemplated would constitute improper fee splitting, particularly in light of the fact that the services are actually rendered to the lawyer. Thus the contingent fee of the lawyer must be computed without regard to the fee payable to the Consulting Service. In California, this presents a particular problem in medical injury tort cases . . . where, by statute, the lawyer's fee must be computed on the net sum recovered after deducting any disbursements or costs. See Business and Profession [*sic*] Code Section 6146(a). Thus, a contingent fee arrangement with the Consulting Service would be improper in medical tort injury claims cases, the very type of case where the services sought to be rendered are likely to be the most useful." (Cal. Opn. 1984-79, *supra*, at p. IIA-244.) The Georgia State Bar's Advisory Opinion No. 48 similarly but more succinctly explains that unless the attorney's fee is computed "without reduction by the fee paid to the consulting service . . . the contract becomes a mere subterfuge for fee splitting between the attorney and a lay organization." (State Bar of Ga., Advisory Opn. No. 48, *supra*, typed opn. at p. 3.)

Frankly, the logic of these conclusions escapes us. They depend for their accuracy not on the fact that the consultant's fee is contingent but rather on the notion that the fee is first deducted before the attorney's percentage is applied to the net recovery. Yet it is well established that a standard and accepted method for calculating a lawyer's contingent fee is to apply the agreed-upon percentage to the net recovery after deducting the reimbursable costs of prosecution. (See Pickus, Fee Agreement Forms Manual, *supra*, § 1.11 at p. 12; 1 Cal. Attorney Practice, *supra*, § 10.22 at p. 10-69.) Several authors have termed this net recovery approach the "preferred" or "recommended" method. (See Flahavan et al., Cal. Practice Guide: Personal Injury, *supra*, ¶ 1:185; Kohlman, *An Equitable Contingency Fee Contract* (1975) 50 State B.J. 268, 269.) If the conclusions in the California and Georgia ethics opinions were correct, this supposedly preferred method—mandated by the Legislature in medical malpractice cases—would violate the ethical fee-splitting prohibition at least in every other type of case. Such a result makes no sense.

In any event, the rationale underlying the fee-splitting doctrine would not justify its application here to invalidate an otherwise proper contract. The purpose of the rule is to assure control of the litigation by the lawyer, discourage solicitation by lay intermediaries and to protect clients from unreasonably high fees. (See, e.g., *Emmons, Williams, Mires & Leech* v. *State Bar* (1970) 6 Cal.App.3d 565, 573-574 [86 Cal.Rptr. 367]; ABA Com. on Ethics and Prof. Responsibility, Formal Opn. 87-355 (1987) [ABA/BNA Lawyers' Manual on Prof. Conduct (Bur.Nat.Affairs 1990) p. 901:111].)

Obviously concerns about solicitation are irrelevant where the lay organization receiving a fee becomes involved in the case only after the lawyer is retained by the client.[17] Concerns about control may be relevant, but they exist anytime an entity other than the lawyer is paid on a contingent basis. There is no greater danger where the lawyer's fee is calculated based on the net rather than gross recovery. Finally, the ethics opinions suggest that the contingent fee consulting contract is acceptable if the attorney's percentage contingent fee is calculated based on the gross (rather than net) recovery; if calculated based on net (leaving more money for the client), the contract constitutes improper fee splitting. Certainly the interest in protecting clients from unreasonably high fees is not served where application of the prohibition has the effect of requiring the client to pay a greater fee.

## IV

We perceive, however, another problem which prevents us from merely approving the Foundation contract and ordering that the $125,000 be paid. As we noted earlier, in a medical malpractice action there is a necessary relationship between the amount paid by a client as "costs" and the amount paid as attorney fees, i.e., the costs are deducted from the recovery before the attorney's fee is calculated. Moreover, because "[m]any of the various functions performed by lawyers in preparing cases for trial may be performed by others also" (D.C. Opn. 55, *supra*), the work of a consultant may supplant the work of a lawyer and thereby affect the lawyer's fee. Because the trial court here found the contract invalid on its face, it had no occasion to consider these relationships in assessing the reasonableness of the Foundation contract or of the fee charged by Ojeda's lawyers.

Although attorneys are ethically prohibited from charging an unreasonable or unconscionable fee (Cal. Rules of Prof. Conduct, rule 4-200; ABA Model Rules of Prof. Conduct, rule 1.5 (a) and (c); *Cazares* v. *Saenz*, *supra*, 208 Cal.App.3d at p. 287), courts normally do not inquire into reasonableness in the absence of an objection by the client. An exception exists, however, where the lawyer represents a minor or incompetent person and recovers funds by way of a judgment or settlement. In such cases, the court must approve the payment of reasonable costs and fees. (Prob. Code, §§ 3600 and 3601.)

Several of the ethics opinions which consider the issue of a contingent fee consulting contract have noted the relationship between the amount the client spends on a consultant and the amount spent on a lawyer. ABA

---

[17]Different issues might arise if the consulting service solicited the client and then referred the case to an attorney who agreed to use the consulting service in prosecuting the case.

Formal Opinion 87-354 notes: "To the extent the Consultant is assuming responsibility for services which the lawyer would normally provide, and may be required to provide as part of the normal service for a customary contingent fee, the lawyer's service is reduced, and what might otherwise be a reasonable contingent fee becomes unreasonable." (ABA Formal Opn. 87-354, *supra*, at p. 901:108.) The District of Columbia Bar's Opinion No. 55, *supra*, similarly observes that a consultant's services "may displace lawyer work. To the extent that this happens, through its analysis of records, finding and interviewing witnesses, preparing factual statements for experts, and similar services the reasonableness of the lawyer's contingent fee percentage may be affected."

A thorough exploration of these concerns was provided in Opinion No. 572 by the New York State Bar Association's Committee on Professional Ethics. (58 N.Y. State Bar J. (Feb. 1986) p. 64.) As with most of the relevant ethics opinions, the committee was asked to comment on the propriety of a lawyer's recommendation that a client contract with a medical-legal consulting service on a contingent fee basis. After surveying the numerous authorities on the issue, the committee commented:

"The principal ethical problems that we have with the proposed agreement relate to the reasonableness of the 20% contingent fee component in the event of recovery and also its close relationship to services customarily provided by personal injury and malpractice lawyers under their contingent fee retainers. Since contingent fee agreements between lawyers and their clients in this state in medical malpractice cases are subject to [statutory limitations][18], the lawyer who recommends or guarantees the payment specified in this agreement would involve his client in paying a substantially higher fee than contemplated by the statute for services that are normally provided by the lawyer in competent representation.

"In the contract under consideration, assuming a 30% contingent fee for the lawyer and a 20% contingent fee to the consulting service, the client winds up paying out either 44% (if the consulting service's fee is first deducted as a disbursement) or 50% (if it is not so deducted) of the net recovery. Since the contract also calls for fixed fees payable in advance for an initial medical evaluation and for all services of experts, the client may be getting little more than what the lawyer would normally be obliged to

---

[18]New York Judiciary Law section 474-a (Consol. Laws) is similar to California's Business and Professions Code section 6146 in that it provides for a sliding scale limitation on the amount which can be charged by a lawyer as a contingent fee in a medical malpractice case (i.e., 30 percent of the first $250,000, 25 percent of the next $250,000, etc.). Section 474-a also tracks section 6146 in requiring that the costs of prosecuting the lawsuit be deducted from the recovery before the attorney's fee is calculated.

provide for a fee that does not exceed the statutory percentage of the recovery—i.e., competent legal representation. . . .

"Thus the lawyer who recommends that a client enter into this kind of agreement may have an ethical obligation to reduce his own fee, so as to avoid an arrangement [where that fee] is clearly excessive. Unless this were done, the client would be paying well more than the statutory percentage of the recovery for what lawyers have customarily performed as part of their legal services. . . .

"We conclude, therefore, that there could be a serious ethical problem involving either the reasonableness of the expenses incurred or the reasonableness of the lawyer's contingent fee contract, at least where the contract calls for a contingent fee for the consulting service as high as 20%. It would be a highly unusual case that would ethically permit a lawyer to advise a client to expend an additional percentage of this magnitude for non-legal services in addition to the fixed fees and disbursements payable for all expert testimony."

Like New York, California has statutorily limited the contingent fees which can be charged by lawyers in medical malpractice cases. Accordingly, the concerns expressed by the New York committee are particularly pertinent. To the extent a California lawyer continues to charge the maximum MICRA fee but succeeds in transferring significant amounts of work and/or economic burden to a consulting service which is separately compensated by the client without regard to the MICRA limitations, the purpose of the legislation is frustrated. We therefore believe the trial court must have the opportunity to review the entire package of attorney and consultant fees in this case. One cannot be declared "reasonable" or "unreasonable" without reference to the other.

The trial court's task will be to determine the maximum costs and fees for which the client may be liable and then to allocate that amount between the Foundation and Ojeda's trial attorneys. The Foundation's involvement does not alter the fact that the total amount paid by Ojeda must equal or be less than the statutory limits specified in MICRA. Reduced to a mathematical formula, this means that what Ojeda pays in (A) attorney fees, (B) fees to the Foundation, and (C) separately identified expenses cannot exceed (1) the maximum attorney fee allowed under Business and Professions Code section 6146, subdivision (a) plus (2) all allowable "disbursements and costs" within the meaning of section 6146, subdivision (c).

To accomplish this task, the court must first determine the Foundation's reasonable fee evaluated as of the time the contract was entered into. Here,

the Foundation's requested fee of $125,000 amounts to 11.4 percent of Ojeda's ultimate recovery. The trial court must determine whether this fee—considered in light of the anticipated services to be performed by the Foundation, the delay in payment, and the risk of nonpayment—was a reasonable one or whether some lesser percentage fee is mandated. (See *Cazares* v. *Saenz, supra,* 208 Cal.App.3d at pp. 287-288.)

Because MICRA places no limitation on the amount of "disbursements or costs" which may be "incurred in connection with the prosecution or settlement of the claim" (Bus. & Prof. Code, § 6146, subd. (c)), such expenses are to be paid "off the top" of the recovery. Once the Foundation's total fee is determined, the court must decide what portion of that fee is properly characterized as a "cost" of prosecuting the case and what if any portion of that fee is for services which should properly be performed by the attorneys as part of the standard MICRA contingent fee. Here, the attorneys claimed and the court previously approved costs in excess of $27,000.[19] In addition, the Foundation is entitled to that portion of its fee "off the top" for the services it performed which fall into the "disbursements or costs" category.

To make this determination, the court should review the work performed by the Foundation to determine the number of hours attributable to services which no reasonable attorney would charge as an "off the top" cost to the client.[20] The remainder, as a proportion of the Foundation's total services should be multiplied by the Foundation's total fee to yield the amount of the fee which represents a proper "off the top" cost. The remaining portion of the total fee—not a proper "disbursement or cost" within the meaning of section 6146, subdivision (c)—must be deducted from the attorneys' maximum MICRA fee to insure that the client does not pay more in total fees and costs than the MICRA limitations will allow.[21]

The submissions we received following the filing of our original opinion from amici curiae and others focused substantially on this latter portion of

---

[19]For some reason, these costs apparently were not deducted from the recovery before calculation of the amount due as attorney fees. In a letter to this court, Sparber Ferguson graciously conceded that this error requires their fee be reduced by over $2,700. At a minimum, the trial court should make this correction on remand.

[20]In making this determination, we assume the trial court will require expert testimony from one or more lawyers who can cast light on the billing practices of reasonable attorneys. To the extent that a particular cost is not unique to medical malpractice actions, the fact that attorneys bill that cost to clients in other types of cases without attorney fee caps would be highly relevant evidence on the issue of the reasonableness of the malpractice attorney's billing choice.

[21]A hypothetical example will illustrate the trial court's task. Assume the court concludes that a reasonable contingent fee for the Foundation, evaluated as of the time the contract was entered into, would have been 10 percent or $110,000. Assume further that after reviewing the Foundation's records of work performed on the Ojeda case, it concludes that 150 of the total

our opinion in which we discussed the distinction between "costs" and attorney fees and suggested the need for an evidentiary hearing to apportion the maximum allowable MICRA fee between Ojeda's attorneys and the Foundation. Amicus curiae County of Los Angeles argued that all services performed by the Foundation are the sorts of tasks the Legislature anticipated would be performed by lawyers when it enacted the MICRA fee cap. Accordingly, the county urges the trial court was correct in refusing to permit any award of fees in excess of MICRA and the only remaining question is the division of the fee between the Foundation and Ojeda's lawyers. In contrast, amici curiae Medical Associations agree that consultation by Foundation employees with Ojeda's trial lawyers about medical aspects of the case is properly chargeable as a "cost" within the meaning of Business and Professions Code section 6146, subdivision (c)(1). Because, however, lawyers are currently permitted to advance costs to the client with repayment contingent on a successful outcome (see Cal. Rules Prof. Conduct, rule 4-210), the Medical Associations argue that such a contingency factor is necessarily part of the attorney's customary services and is thus subject to the MICRA cap. They also assert that any time spent by the Foundation locating and preparing expert witnesses constitutes a quintessential attorney function also subject to the MICRA limitations.

The Foundation, the coguardians and the amici curiae practitioners were generally supportive of the approach taken in our original opinion. The practitioners questioned whether a finding that the Foundation's work supplanted traditional lawyer work should necessarily result in a reduction of the attorney fees rather than a proportionate reduction of both the attorney and consultant's fees. In a similar vein, Sparber Ferguson argued that the Foundation made representations before the consulting contract was signed to the effect that employment of the Foundation would not result in any reduction of the attorney fees. They accordingly argue there should be no reduction of the attorney fees even if the Foundation services supplanted

---

170.5 hours (see *ante*, p. 5) constituted legitimate "disbursements or costs" which a reasonable attorney could charge to the client above and beyond the attorney's fee.

In making the fee calculation, the court should first determine the total amount of "off the top" costs, multiplying the Foundation's fee ($110,000) by 88 percent (150/170.5) yielding $96,800. To this figure must be added the costs advanced by Ojeda's lawyers ($27,528 [see *ante*, p. 6]) for total costs of $124,328. This figure must then be deducted from the total settlement ($1.1 million) leaving an amount of $975,672 from which to calculate the attorney fee under MICRA. Applying the applicable percentages (see *ante*, fn. 5), the total attorney fee under MICRA would be approximately $139,234. Of this amount, $13,200 is already included in the Foundation's fee (12 percent of $110,000) leaving a fee of $126,034 to be paid to Ojeda's trial attorneys, Sparber Ferguson. The Foundation would of course be paid its reasonable fee of $110,000.

This hypothetical is included solely to illustrate the process of calculating the applicable fees and in no way suggests this court's view of what should be a reasonable fee for the Foundation or what percentage of that fee should be deemed a legitimate "cost."

customary attorney work product; instead, the Foundation's compensation should be limited to legitimate "cost" items which can be compensated in addition to the MICRA cap.

While we have read with interest and very much appreciate the input we have received, the divergence of opinions persuades us of the correctness of our original decision to remand the matter to the trial court for an evidentiary hearing at which the underlying facts can be fully explored. Clearly we cannot agree with the County of Los Angeles's contention that nothing a consultant does to assist an attorney is a separately reimburseable "cost" for purposes of Business and Professions Code section 6146, subdivision (c)(1). And while we might assume, consistent with the argument of the Medical Associations, that lawyers regularly locate and contact individual experts on their own in medical malpractice cases, we are unwilling on this record to hold as a matter of law that obtaining the assistance of a consultant in this regard could not be a separate "cost" item.

We also disagree with the Medical Associations' other argument that no separate compensation can be provided for the "contingency" factor. The fact that the Rules of Professional Conduct *permit* a lawyer to make a contingent advance of costs to the client—in effect providing the client with an interest-free loan which may never have to be repaid—surely does not mean that medical malpractice lawyers are *required* to do so. Indeed, if Ojeda's lawyers refused to advance the costs of prosecuting the lawsuit and Ojeda obtained a loan from a bank in order to pay those costs, we certainly would not hold that MICRA would require the interest payments on the loan be deducted from the attorney fees.

Finally, we are not persuaded to change our view that if the trial court determines the Foundation's services include work for which no reasonable lawyer would separately bill the client, the reasonable value of those services, for the purposes of the Probate Code section 3601 assessment, must at least initially be paid to the Foundation and deducted from the maximum MICRA fee otherwise payable to the attorneys. The attorney bears ultimate responsibility for safeguarding the interests of the client and it was Sparber Ferguson's decision initially to recommend that Ojeda contract with the Foundation. The trial court's only function at this juncture is to insure that the fees paid by Ojeda are reasonable. Obviously if the Foundation made representations to Sparber Ferguson which are not part of the contract, the attorneys may have an independent action against the Foundation to the extent their fees are ultimately reduced.

V

Certainly the restrictions we have articulated which will be applied by the trial court on remand will insure that contingent fee consulting contracts

cannot be used as a simple end run around the MICRA limitations. If that is their principal purpose, we suspect such contracts will quickly become a legal dinosaur and this opinion a mere academic footnote. The fact that the contracts are utilized in states without any attorney fee cap, however, would suggest there may be other reasons for their existence. If so, we hope this opinion will help focus the public policy discussion which may occur elsewhere and provide guidance to trial courts asked to enforce consultant contracts and to lawyers attempting to advise clients and prosecute lawsuits consistent with the practical challenges of real world legal economics.

## DISPOSITION

To the extent it approves compromise of the minor's claim, the trial court's order is affirmed. It is reversed to the extent it approves payments to Ojeda's attorneys Sparber Ferguson and refuses to approve payments to the Medical Quality Foundation. The court is directed to reconsider the guardian's petition, taking additional evidence as may be required and rendering a decision consistent with the guidelines expressed in this opinion.

Kremer, P. J., and Work, J., concurred.

## APPENDIX

Established in 1976

TOLL FREE 1-800-336-0332
In Virginia and D C (703) 437-3333

**The Medical Quality Foundation**
The American Board of Medical-Legal Consultants
National Headquarters
104 Elden Street
Herndon, Virginia 22070

### MODIFIED CONTINGENCY FEE CONTRACT

This Contract is made by and between The Medical Quality Foundation (hereafter referred to as "MQF") and:

1. _Connie M. Ojeda, as Guardian An Litem for Francis R. Ojeda_

and 3. _____ (hereafter referred to as "Plaintiff(s)" and/or "Claimant(s)

Each Plaintiff represents that the foregoing named plaintiffs constitute all parties named or to be named as Plaintiffs in the case and each Plaintiff agrees to notify MQF if and when any additional parties are to be added as Plaintiffs in the case. It is expressly understood that MQF is entering into this Contract based upon the understanding that the above-named constitute all parties named or to be named as Plaintiffs in the case. Plaintiffs agree to provide MQF with a copy of the complaint (or other papers initiating the action) and any amendments thereto, any settlement documents or agreements, and any final judgments or resolutions in the action.

It is understood that under this Contract, Plaintiff's attorney retains full control of Plaintiff's case and remains fully responsible for the course and conduct of Plaintiff's case. This Contract is completely unrelated to any contract for services and expenses which Plaintiff may have with his attorney. Any fees and expenses for services due under any contract Plaintiff may have with his attorney are not reduced by fees payable to MQF under the terms of this Contract, nor are any liens, costs or fees of any kind deducted from MQF's percentage of the total recovery.

Under this Contract, MQF will use its best efforts to locate medical expert(s) to review Plaintiff's case, prepare reports and, if necessary testify. It is understood that the Medical Experts have no knowledge of this Contract, do not benefit from this Contract, are not employees or agents of MQF, and are fully paid prior to providing any professional services The fees paid Medical Experts are in no way contingent upon the outcome of Plaintiff's case. Plaintiff agrees that he will neither offer to pay nor pay to Medical Experts any fees in addition to those stated herein.

**1. Initial Fee for MQF Work Product Consultant and Expert Reports.** The fee for an initial MQF Work Product Consultant Report supplied by one of the Medical Directors of MQF is One Hundred and Fifty Dollars ($150). If Plaintiff's case is deemed meritorious by MQF this fee will be applied to, and will satisfy in full, the cost for the first report of an independent medical expert, other than a Director of MQF MQF reserves the right, at its sole discretion, to supply the initial Medical Expert Report in lieu of a written MQF Work Product Consultant Report. There will be an additional fee of One Hundred and Fifty Dollars ($150) for each additional report by each additional Medical Expert and/or for supplemental Medical Expert reports requested by Plaintiff's attorney. In cases where the medical records and/or other records or documents to be reviewed exceed 200 pages in addition to the above-stated fees there will be a fee of twenty-five cents (25c) per page for each page in excess of 200 pages per Expert Report requested.

MQF and each Expert require eight calendar weeks to complete their review In the event a report is required on an expedited or rush basis, Plaintiff agrees to pay an additional charge of Five Hundred Dollars ($500).

**2. Conferences With Medical Directors of MQF.** All telephone and/or in-person conferences with Medical Directors of MQF are free. The word "free" means there is no separate charge for the services of MQF

**3. Assistance of Medical Directors of MQF.** If requested, a Medical Director of MQF (if scheduling permits, if adequate notice is given, and if the case and circumstances so warrant) will make himself available to Plaintiff's attorney for depositions of expert witnesses and defendants and/or at trial All services of the Medical Directors of MQF are provided at no additional charge to Plaintiff Travel expenses and room and board of the Medical Directors must be prepaid. Transportation expenses for Medical Directors are payable prior to departure. Arrangements for hotel and food costs for Medical Directors are to be made in advance and are to be billed directly by the hotel to Plaintiff or Plaintiff's attorney.

© April 1986   The Medical Quality Foundation

ATTACHMENT

**4. MQF's Contingency Fee.** MQ. _ .ontingency fee shall be twenty percent (2u _, of the gross recovery(ies) arising from any and all injuries and/or claims, both known and unknown, arising out of the injuries which are the subject of this Conti act The gross recovery(ies) shall consist of the total of all amounts awarded all Plaintiffs in the case and their spouses children heirs and/or assigns, by jury and/or other factfinding body and the total of all amounts offered and accepted in settlement by all Plaintiffs and their spouses, children heirs and/or assigns Any amounts paid by defendants and designated as attorneys fees ' shall be included in the gross recovery MQF's contingency fee shall include 20% of any interest earned by Plaintiffs and their spouses. children, heirs and/or assigns on the gross recovery

In the event. for any reason, MQF's twenty percent contingency interest in a particular Plaintiff's award or recovery is reduced by any court (i.e , a minor), it is understood and agreed that the remaining Plaintiff(s) will remain jointly and severally liable to MQF for twenty percent of the total gross recovery to all Plaintiffs. including the Plaintiff whose fee due MQF has been reduced Plaintiff(s) understands and agrees that if additional persons not named herein become parties in the case and such person(s) refuse to join in this Contract for any reason, that Plaintiff(s) will be jointly and severally liable to MQF for twenty percent of the total gross recovery(ies) to all Plaintiffs and/or Claimants including those named herein as well as those Plaintiffs or Claimants not named herein.

It is understood MQF is to receive its full twenty percent (20%) of the total recovery, regardless of the result or format of its evaluation and independent of the time to settlement MQF s twenty percent contingent fee shall be considered a lien against the total recovery

**5. Contact With Medical Experts.** All contacts with the Medical Expert(s) supplied by MQF must be made through MQF to assure the contractual fees stated in this contract.

**6. Charges of Expert Witnesses:**

**Conferences.** The fee for all telephone conferences with an Expert is Seventy-Five Dollars ($75) per hour with a one hour minimum charge The fee for all in-person conferences with an Expert or physical examinations by an Expert is Seventy-Five Dollars ($75) per hour with a two hour minimum charge.

**Depositions.** The fee for a deposition taken within a thirty mile radius of an Expert s home address is Seventy-Five Dollars ($75) per hour with a four hour minimum The fee for a deposition taken at a location where an Expert must travel more than a thirty mile radius from his home address is Five Hundred Dollars ($500) per day plus all reasonable travel expenses including room and board where necessary These fees apply regardless of whether the deposition is noticed by Plaintiff or Defendant or ordered by the Court. Any requested research, reading, additional work and/or reading of depositions and/or reading and signing of an Expert s own deposition is Seventy-Five Dollars ($75) per hour.

**Court and Other Non-Deposition Expert Testimony.** The fee for court and other non-deposition testimony of each expert witness approved by Plaintiff and Plaintiff's attorney is Five Hundred Dollars ($500) for each twenty-four hour day or any portion thereof plus all reasonable travel expenses including room and board for each witness (Plaintiff understands that some Experts require a fee of Seven Hundred and Fifty Dollars ($750) for a twenty-four hour day or any portion thereof plus all reasonable travel expenses including room and board. Where this is the case, this information will be disclosed to Plaintiff or Plaintiff s attorney for approval. before engaging such Expert.) Each twenty-four hour day is deemed to commence with the Expert's departure from his home or office and to end with the Expert s return to his home or office and shall include eight hours of uninterrupted sleeping time

**7. All Fees Payable in Advance.** Plaintiff understands and agrees to pay all Expert fees in advance It is understood that such fees are payable to the Expert but are to be forwarded to and are to be received by MQF at least fourteen (14) days prior to the scheduled or estimated date of the Expert s telephone or in-person conference, deposition, or court or other appearance Plaintiff understands that MQF can make no guarantees regarding the availability of the Expert and recommends that arrangements for the appearance of the Expert be made as far in advance as is possible to enhance availability It is understood that no Expert will travel until said fees are paid and until round trip airplane tickets (where applicable) are prepaid

**8. Refunds.** All prepaid fees for Expert telephone conferences, in-person conferences, deposition, or non-deposition testimony, shall be refunded in full provided MQF is given seven calendar days notice of cancellation or postponement In the event less than seven calendar days notice is given the amount of refund, if any shall be left to the discretion of MQF in consultation with the Expert All unused prepaid travel expenses shall be refunded in full.

9. **No Guarantees.** Plaintiffs undo̲̲ ̲.̲.̲nd that MQF cannot and does not make a̲.̲.̲y guarantees or assurances as to the wording or substance of Expert reports and makes no guarantees or assurances as to the quality or nature of the Expert(s) testimony, the credentials of the Expert(s), the admissibility of the Expert(s) and/or his testimony or opinion, the cooperation of the Expert, or any matters relating to the outcome of the litigation. If the Expert fails to appear on the date arranged for any appearance, it is understood and agreed that MQF's sole liability will be limited to the return of any and all fees paid in advance for that appearance Plaintiffs agree to hold MQF harmless from any loss suffered as a result of an Expert's opinion and/or failure to appear, and this Contract shall remain valid.

Plaintiffs further understand that the continued or indefinite availability of Expert witnesses cannot be guaranteed It is understood that if an Expert becomes unavailable for testimony, MQF shall attempt to find a replacement Expert The fees for any new Expert(s) must be prepaid. Should MQF be unable to supply substitute or additional Expert(s), no liability shall accrue to MQF and/or its agents and this Contract shall remain valid.

10. **Attorney's Failure to Disburse Funds in Accordance With this Contract.** Plaintiff understands that should Plaintiff's attorney fail, for any reason to disburse sums due MQF under the terms of this Contract to MQF, that Plaintiff shall be responsible for the amounts due MQF, together with attorneys' fees incurred by MQF in collecting any amounts due MQF under this Contract, as well as costs and interest at the rate of twelve percent (12%) from date of payment to Plaintiff and/or Plaintiff's attorney, to date of payment to MQF.

11. **Severability.** If any provision of this Contract shall be adjudged to be void and unenforceable, the same shall in no way affect any other provision of this Contract or the validity or enforceability of this Contract.

12. **Modification.** No modification of this Contract shall be valid unless such modification is in writing and signed by the parties hereto.

13. **Words and Gender or Number.** As used herein, unless the context clearly indicates the contrary, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

14. **Governing Law.** The parties agree that this Contract will be construed in conformity with the laws of the Commonwealth of Virginia that the Contract is made in the Commonwealth of Virginia, that jurisdiction and venue for any legal disputes shall be before the Circuit Court for the County of Fairfax Commonwealth of Virginia, and that any and all judgments rendered shall be enforceable and applicable in the city, county and state of plaintiff and/or plaintiff s attorney.

15. **Entire Contract.** This document contains the entire agreement of the parties. The parties agree that there are no representations or warranties except as stated in this Contract. This Contract supersedes any prior agreement between the parties relating to the subject matter hereof

16. **Waiver.** No waiver of any provisions of this Contract shall be valid unless in writing and signed by the person or party against whom charged. The failure of any party to insist upon strict performance of any of the provisions of this Contract shall not be construed as a waiver of any subsequent default of the same or different nature.

17. **Consultation with Attorney.** Plaintiff acknowledges that this Contract is entered into voluntarily without coercion that no guarantees or assurances have been made, and that Plaintiff has been strongly urged to consult with an attorney before entering into this Contract.

If Plaintiff is not represented by an attorney at this time, it is understood and agreed that Plaintiff must obtain an attorney to represent Plaintiff, that the attorney retained must be advised of this Contract and agree to distribute funds in accordance with the terms of this Contract

Plaintiff understands that neither MQF nor its Medical Directors, agents or employees, are attorneys, that they have no expertise in law and that they have not given, and will not give, any legal advice.

18: **Minors/Conservatorships/E.....s.** If a Plaintiff or potential Plaintiff is or wh. _ _ _ minor, mentally incapacitated adult, or estate that I am representing, I attest that I am legally authorized (as legal guardian or conservator, or as legal representative, administrator or executor of the estate) to enter into and sign this Contract for myself individually and as (specify legal authorization) _GUARDIAN AD LITEM_

on behalf of: _FRANCES R. OJEDA_
(Name)

IN WITNESS WHEREOF, the undersigned have signed this Contract:

1) PLAINTIFF: _Connie M. Ojeda_    _Connie M). de Ejar_
   (Printed Name)                   (Signature)

   DATE: _March 11, 1987_    TELEPHONE: (619) 691 - 0762

   ADDRESS: _1421 Nacion Ave Chula Vista, CA 92011_

2) PLAINTIFF: _____
   (Printed Name)              (Signature)

   DATE: _____   TELEPHONE: (____) _____

   ADDRESS: _____

3) PLAINTIFF: _____
   (Printed Name)              (Signature)

   DATE: _____   TELEPHONE: (____) _____

   ADDRESS: _____

Sworn to and subscribed before me this _11th_ day of _March_ 19_87_

Witness my hand and official seal. _Beverly Hooser_ _____ Notary Public

OFFICIAL SEAL
BEVERLY HOOSER
NOTARY PUBLIC - CALIFORN
SAN DIEGO COUNTY
My Comm. Expires June 10 198

**As the Plaintiff's attorney:** I have explained this Contract to the Plaintiff(s) and am satisfied that they understand its provisions and legal intent. The services to be performed by MQF shall benefit me and shall be adequate consideration for my duties under this contract. If I associate with another attorney on this case or if another attorney assumes responsibility for this case, I will advise them of this Contract and their obligations thereunder. I agree to distribute the funds of any recovery in this case, pursuant to this contract between the Plaintiff and MQF. I further agree that each Expert's name is the trade secret of MQF and neither I, nor any member of my firm, will contact or use that Expert on any other case without prior written permission of MQF. This contract shall remain confidential and shall not be disclosed to the Expert(s). Should such use of this Expert occur without advance written permission from MQF or should disclosure of this contract to the Expert(s) occur, it will be considered tortious interference in business, as it results not only in loss of income to MQF, but also serves to impair the working relationship between MQF and the Expert(s).

X _____ William H. Naumann

ATTORNEY: _DAVID B. ROPER_    _David B. Roper_
          (Printed Name)       (Signature)

DATE. _3/12/87_    TELEPHONE: (619) 239 - 3600

ADDRESS. _701 'B' ST. SAN DIEGO CA 92101_

ACCEPTED BY _Jay Arasim_    DATE _8/7/87_
            Agent for MQF