Filed 2/10/15  In re Jospeh C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Joseph C., a Person Coming Under the Juvenile Law. | B256902 |
| _____ | (Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. CK90366) |
| Plaintiff and Respondent, | |
| v. | |
| ANDREW C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos E. Vazquez, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency proceeding (Welf. & Inst. Code, § 300),[1] appellant Andrew C. (father) filed a section 388 petition seeking additional reunification services, and sought application of the parent-child relationship exception—also called the "benefit exception"—to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). The juvenile court denied father's petition, declined to apply the benefit exception, and terminated parental rights. This appeal followed. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Joseph C., born in 2008, is the son of Stacy S. (mother) and father. The family initially came to the attention of Los Angeles County Department of Children and Family Services (Department) in July 2009, when Joseph was less than a year old. Father, then 18 years old, and mother, then 16 years old, were receiving voluntary family maintenance services when father was arrested for felony vandalism in March 2010. The following month, mother was arrested for possession and sale of drugs. Joseph was placed with paternal cousins, Mr. and Mrs. M. Father was sentenced to a five-year prison term.

Upon mother's release, she received additional services while Joseph remained with the M.'s. Joseph spent one year with the M.'s before being returned to mother in May 2011.

In October 2011, the Department filed the present dependency petition based on mother's inability to protect Joseph as a result of her unresolved drug problems.[2] (§ 300, subd. (b).) Father, although non-offending, could not care for Joseph because he was incarcerated. Joseph was detained with the M.'s, where he remained throughout these proceedings.

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2] Mother received 12 months of reunification services, but was unable to comply with the case plan. Her rights have been terminated, and she is not a party to this appeal. We therefore focus our discussion on father's reunification efforts.

2

The court adjudicated Joseph to be a dependent child as a result of mother's unresolved drug problems. The court granted mother family reunification services, and granted father services for incarcerated parents. Father was granted monitored visitation and directed to complete a parenting class.

Father was released on parole in April 2012. As a condition of parole, father was denied all contact with children under the age of 18. This no-contact rule, which was imposed because of father's prior sustained juvenile felony petition for lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (a)),[3] remained in place throughout the 18-month reunification period.

While on parole, father lived with the paternal grandfather. In April 2012, the Department provided father with bus tokens and a no-cost referral for a parenting class.[4] He did not enroll in the class until seven months later.

The court terminated mother's reunification services at the 12-month hearing. She filed a section 388 petition seeking reinstatement of services, which was denied and affirmed on appeal. (*In re Joseph C.* (July 31, 2014, B252913) [nonpub. opn.].)

During the final six months of the reunification period, father completed the court-ordered parenting class, but remained barred by the no-contact rule from visiting Joseph. At the suggestion of his parole officer, father participated in voluntary anger management and outpatient drug programs (he had six negative random drug tests from December 2012 to April 2013), 12-step meetings, and group meetings on conflict resolution, relapse prevention, and addiction education.

The court terminated father's services at the 18-month review hearing in June 2013. A permanency planning hearing was scheduled for October 2013. (§ 366.26.)

---

[3] It was undisputed that at age 14, father was arrested for sexual abuse of a minor (Pen. Code, § 288, subd. (a)), sent to juvenile hall and a group home, and provided with counseling, therapy, and sexual abuse offender treatment.

[4] While in prison, father was on a waiting list for a parenting class, but was moved to another unit before he could enroll in the class.

The M.'s were interested in adopting Joseph, who regarded them as his parental figures, and the Department was recommending adoption as the permanent plan.

In September 2013, the no-contact rule was lifted when father was discharged early from parole. The juvenile court advanced the permanency planning hearing date and granted father weekly four-hour monitored visits. Father had his first visit with Joseph on October 27, 2013, two years after mother's drug problems led to Joseph's placement with the M.'s.

In October and November 2013, the Department proceeded with the adoption home study of the M.'s based on its position that maintaining Joseph's stable placement with the M.'s was in his best interest. The Department reported that Joseph continued to thrive with the M.'s, who remained committed to providing him with a permanent adoptive home.[5]

By December 2013, father had completed six monitored visits with Joseph. However, the Department advised the court that it continued to believe adoption by the M.'s was in Joseph's best interest. The M.'s had consistently provided for the child's needs for two years and were prepared to adopt him. Father, who had been unable to establish a father-child relationship with Joseph during the past two years, was not a parental figure to Joseph.

Later that month, the court scheduled a permanency planning hearing date after finding that: (1) continued jurisdiction was necessary; (2) returning Joseph to his parents would create a substantial risk of detriment to the child and was likely to result in severe emotional or physical harm; (3) Joseph's placement with the M.'s was necessary and appropriate; (4) the case plan was necessary and appropriate; (5) the Department had provided reasonable reunification services; and (6) the proposed permanent plan of termination of parental rights and adoption was appropriate.

---

[5] In November 2013, mother, who was in a new relationship, gave birth to a baby boy, who was prenatally exposed to drugs. The Department was investigating a new allegation against mother regarding the baby.

Thereafter, tensions mounted between the M.'s, who wanted to adopt Joseph, and father and the paternal grandparents, who sought to terminate jurisdiction or, at minimum, obtain additional reunification services.[6]

The Department and Joseph's attorney shared the view that a permanent plan of adoption by the M.'s was in the child's best interest. The Department provided an addendum report describing the confusion caused to the child by father's sudden appearance: "Recently, during a monitored visit with birth father, child stated, 'Daddy, I did not know you were my daddy, I thought Mr. M. was my daddy.' Father appropriately stated, 'No, but Mr. M. is my godfather.' The father has only recently begun visits with the child since October 2013; therefore, the child does not know birth father as a parental figure. Both PGF and father state that prior to discharge from parole, father would obtain occasional updates on child from PGF; however, obtaining updates from PGF is different from taking a direct parental role. Father's visitation consists of arts and crafts and board games, which he brings back and forth each week, and other pastimes. When father speaks to the child, he has to reinforce that the child is his son. The Department believes that it is in the child's best interest to curtail birth parent visits, as visitation undermines the adoption process. . . . The Department respectfully requests that the child be legally freed for adoption."

Shortly before the section 366.26 hearing, father filed a section 388 petition seeking additional reunification services, including unmonitored visits and possible overnight visits, as a prelude to gaining custody of his son. As evidence of a change in circumstances, father pointed to his recent discharge from parole, his recent visits with his son, and his new job.

---

[6] Before the February 2014 hearing, the paternal grandmother filed a section 388 petition requesting that the court terminate jurisdiction. The paternal grandmother accused Mrs. M. of hitting Joseph and consuming alcohol at lunch and on weekends. The Department opposed the paternal grandmother's petition after conducting an investigation and finding the accusations against Mrs. M. to be unwarranted. The court denied the petition.

In opposition, the Department argued the reunification period was over, and it would be detrimental to the child to remove him from the M.'s, who were his only parental figures. The Department contended that because Joseph had lived with the M.'s for the better part of his life and was strongly attached to them as parental figures, his present stability would be negatively impacted if he were returned to father, who had been unable to establish a parent-child relationship during the past two years.

The Department acknowledged that prolonging the case was stressful to the adults and detrimental to the child. It believed that father, by threatening litigation, was showing increased frustration at his inability to obtain custody of his son.[7] According to one report, father's "rage continues to overshadow the conversation." Father was not calling the M.'s to check on Joseph's well-being, but was providing toys and snacks that the M.'s thought were inappropriate. Mrs. M. believed that father was interacting less with Joseph during visits, and that father had made up an excuse to end a visit early.

At the combined section 388 and section 366.26 hearing in April 2014, the court considered father's requests for additional services and application of the benefit exception to termination of parental rights. Father testified that in the parenting course, he learned different methods of discipline for various stages of a child's development. For example, when Joseph recently threw a tantrum, father was able to calm him down by speaking slowly and at Joseph's level of understanding. In the drug program, father learned to better understand himself and be more patient and understanding with Joseph. Father did not miss a single visit with Joseph, and was flexible about rescheduling visits. Joseph and father enjoyed taking father's dog to the dog park, playing tag, playing on swings, reading books, coloring, and playing Pokemon. Father was committed to helping Joseph with schoolwork; on the few occasions when their visits occurred after school,

---

[7] The Department reported that father had contacted the American Civil Liberties Union about suing the school, the Department, and Mrs. M. for civil rights violations based on the alleged omission of the paternal grandfather's name from the child's emergency contacts card. Father allegedly misrepresented to the school principal that father was authorized to pick up the child from school.

6

father helped review his homework. Father has a job, will be able to take Joseph to school and medical appointments, and can arrange for child care. When Joseph asked difficult questions—such as why father does not come to Joseph's house, or why Joseph does not go to father's house—father did not discuss the dependency case, but simply answered "I don't know." During a recent visit, Joseph hurt himself and went crying to father for a hug. At a court hearing, Joseph began crying and asked to see father. That prompted the CSW to allow father to visit with Joseph at the courthouse, where they played with toys, colored, and watched a movie. As they left the courthouse, Joseph ran over to father and paternal grandparents for a hug.

Regarding his sustained juvenile child molestation petition, father explained that in 2006, he lived in a group home and participated in an 18-month sexual abuse counseling program. As a result of counseling, he no longer has sexual impulses toward children. He is aware of the warning signs, and will seek immediate help if necessary.

At the conclusion of father's testimony, the court found the first prong of section 388—a change in circumstances—had been satisfied. The court then invited argument regarding the second prong—whether the proposed change would be in the best interest of the child.

Father's attorney argued that additional reunification services would benefit the child. Father was employed, emotionally mature, visiting regularly, willing to engage in educational activities, and developing a bond with his child. Counsel believed that with six additional months of services, father would be ready to reunify with Joseph.

The Department viewed father's juvenile record and recent felony conviction as cause for concern. The Department argued it would not be in Joseph's best interest to grant father additional reunification services.

Joseph's attorney agreed that additional services would not be in the child's best interest. Counsel pointed out that the reunification period was over, and father had not progressed beyond monitored visitation. Counsel stated: "It would not be in Joseph's best interest to remove him from a home where he knows the current caretakers as his parents. Father, Mr. C[.], currently is a playmate. Father testified today that when he had

7

the visit with Joseph yesterday, he played with his Spiderman toys. They watched a movie together. They colored. When father previously testified, he stated that they go to the dog park, they play Pokemon. On page 8 of the .26 report dated March 27, 2014, near the bottom of the page, when asked about father visiting, the child said, 'Daddy and Papi, sit down while I go play.' So it is apparent that father has not been acting in a parental role. The . . . father . . . for Joseph at this point in time is the current caretaker [Mr. M.]. This 5-year-old boy deserves to be with the persons who really have been his parents for the majority of his young life, and to remove him at this point in time, [to] place him [in the] home of parent, father, I believe would not be in his best interest."

Joseph's attorney also urged the court to not apply the benefit exception to termination of parental rights. Counsel stated that father's visits were enjoyable "play dates," but did not outweigh "the permanency and stability offered by adoption of Joseph by his caretakers. These are the caretakers who he has lived with three out of five years of his life, and six months of visitation does not amount to three years of parenting. Caretakers provide food, shelter care, and guidance. They are his parents, the ones he calls 'Mommy' and 'Daddy,' and accordingly, I am requesting that parental rights be terminated as no exception applies."

After weighing the evidence and arguments of counsel, the court concluded it would not be in Joseph's best interest to grant additional reunification services. The court agreed with the observations that the reunification period was over, father had not progressed beyond monitored visitation, and the child—who has lived with the M.'s for the majority of his life—considers the M.'s to be his parents.

Turning to the benefit exception to termination of parental rights, the court found that father's early release from parole and recent visits with Joseph represented a change in circumstances that satisfied the first prong of the exception. As to the second prong— whether the benefit to the child of continuing the parent-child relationship would outweigh the benefit of providing the child with a stable and permanent home through adoption—the court found that because father's relationship with Joseph was that of pleasant companionship, severing the relationship would not result in great harm to the

child.  Finding there were no exceptional circumstances to preclude adoption, the court terminated parental rights and declared Joseph freed for adoption.  This timely appeal followed.

## DISCUSSION

### A.    *Father's Section 388 Petition*

Section 388 provides in relevant part:  "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

Where, as here, the 18-month reunification period has expired and the child has remained in an out-of-home placement for an extended period of time—in this case, two and a half years—the presumption that the child should be returned to the parent no longer applies.  As the Supreme Court stated in *In re Jasmon O.* (1994) 8 Cal.4th 398, 420, "at the beginning of the dependency proceedings, our statutory scheme expresses a presumption in favor of keeping parents and children together.  The burden of proof is on the Department to show that an out-of-home placement is necessary at the commencement of the proceedings (§ 361); and, at the mandatory review hearings every six months thereafter, the presumption is that the child should be returned to the parent unless the Department demonstrates that the child's return would 'create a substantial risk of detriment to the [child's] physical or emotional well-being.'  (§§ 366.21, . . . 366.22, subd. (a).)  Nonetheless, the Legislature also recognizes the child's interest in a stable, permanent home . . . , and has provided that the juvenile court should avoid delay and 'give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.'  (§ 352, subd. (a).)  The current statutory scheme makes it clear that the turning point at which the child's interest may outweigh that of the

9

parent is reached no later than 18 months after the child has been removed from the parental home, because the maximum length of time that reunification services are provided to the parent is 18 months.  (§§ . . . 366.21, subd. [(g)], 366.22, subd. (a), 366.26; see also *In re Marilyn H*. [(1993)] 5 Cal.4th [295,] 309.)"

At a hearing on a section 388 petition, "the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make [the requested] change [or modification of a prior order] in the best interests of the child.  (§ 388; *In re Audrey D.* (1979) 100 Cal.App.3d 34, 45; Cal. Rules of Court, [former] rule 1432(f) [presently found at rule 5.570].)  [¶] After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H*., *supra*, 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  (*Id*. at p. 302.)"  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

The evidence in this case supported the court's finding that a further delay in providing Joseph with a permanent placement was not in his best interest.  During the initial phase of the 18-month reunification period, father was still incarcerated, and in the remaining phases, he was barred by the no-contact rule from visiting with his son.  Even after the no-contact rule was lifted, father did not progress beyond monitored visitation. He remained a friendly visitor, and did not develop a parent-child relationship with Joseph.

The M.'s, on the other hand, developed a strong bond with Joseph during the past two and a half years.  Joseph regarded the M.'s as his parental figures.  When father began visiting Joseph, the child was confused because he believed that Mr. M. was his father.

The determination of the child's best interest is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.  (*In re Michael B*. (1992) 8 Cal.App.4th

1698; *In re Corey* (1964) 230 Cal.App.2d 813, 832.) As one court has stated, when a court has made a custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'" (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421; see *In re Mark V.* (1986) 177 Cal.App.3d 754, 759 [accord]; see also *Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831.) And we have recently warned: 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272, quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)" (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

This case is distinguishable from *In re Kimberly F.* (1997) 56 Cal.App.4th 519, in which the appellate court reversed the denial of mother's section 388 petition to regain custody of her two children. In that case, the evidence showed the mother had strong bonds with her children, ages 7 and 10, who were removed from her home because of its unsanitary condition. The children stated that they loved their mother and wanted to return home. (*Id.* at p. 524.)

Joseph was only 18 months old when father was arrested for felony vandalism in March 2010. After the dependency petition was filed in October 2011, Joseph spent the next two and a half years living with the M.'s, who became his parental figures. At the section 366.26 hearing in April 2014, Joseph's attorney described father as a "playmate," and urged the court to deny further services and terminate parental rights in order to free the child for adoption by the M.'s. The record demonstrates that the trial "court properly evaluated the evidence, and placing special weight on the child's need for stability, as was appropriate at that stage of the proceedings, determined that [father] had not carried [his] burden of proof." (*In re Stephanie M., supra*, 7 Cal.4th at p. 319.)

11

B.      *The Benefit Exception to Termination of Parental Rights*

At the section 366.26 hearing, the court selects a permanent plan for the dependent child.  Of the available options, "[a]doption is the preferred permanent plan.  (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1416.)  Freeing a child for adoption requires termination of parental rights.  '[I]n order to terminate parental rights, the court need only make two findings:  (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated.'  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250.)"  (*In re Jasmine T*. (1999) 73 Cal.App.4th 209, 212.)

The benefit exception is one of the few grounds for not terminating parental rights.  (§ 366.26, subd. (c)(1)(B)(i).)  It "applies if termination of parental rights would be detrimental to the child because the 'parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).)"  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

The parent has the burden of establishing the benefit exception by showing that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond."  (*Id*. at pp. 575–576.)

To establish the exception "the parents must do more than demonstrate 'frequent and loving contact' (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418), an emotional bond with the child, or that the parents and child find their visits pleasant.  (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)  Rather, the parents must show that they occupy 'a parental role' in the child's life.  (*In re Beatrice M*., *supra*, 29 Cal.App.4th at p. 1419.) . . .  In other words, the court balances the strength and quality of the natural

12

parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' (*In re Autumn H.*[, *supra*,] 27 Cal.App.4th [at p.] 575.)" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108–1109.)

Father contends that guardianship is preferable to adoption because it would allow the parent-child relationship to continue. The record shows that father was trying to develop a parent-child relationship with his son—he helped Joseph review his homework, he helped Joseph calm down during a tantrum, he comforted Joseph when he hurt himself. But the record does not show that father achieved that objective; his visits did not progress beyond supervised visits, and it was only recently that Joseph became aware that Mr. M. was not his father. This case is therefore distinguishable from *In re Brandon C.* (1999) 71 Cal.App.4th 1530 and *In re Scott B.* (2010) 188 Cal.App.4th 452, in which guardianship was the preferred permanent plan because the mother in each case had visited regularly for several years and had a well-established parental relationship with the children.

Because Joseph lived with the M.'s for most of his life, he was confused by appellant's sudden reappearance and did not realize, until being told, that appellant was his father. Father and Joseph did not have a well-established parent-child relationship. By the December 2013 hearing, father completed six monitored visits, but Joseph had been living with the M.'s for over 24 months. And because Joseph lived with the M.'s while mother was receiving voluntary services from March 2010 to May 2011, most of his life had been spent with the M.'s.

It is difficult for a parent to show the child will benefit from preserving their relationship where, as here, the parent has not "advanced beyond supervised visitation. The difficulty is due to the factual circumstances of the parents in failing to reunify and establish a parental, rather than caretaker or friendly visitor relationship with the child." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Based on all of the circumstances present

13

in this case, we conclude the record supports the court's finding that although father's visits with Joseph were pleasant, they did not have a parent-child relationship. Father has not shown the court erred or abused its discretion in declining to apply the benefit exception to termination of parental rights.

## DISPOSITION

The May 1, 2014 order denying father's section 388 petition and terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

14